Celia ALEMAN, Plaintiff–Appellant,

v.

Dan E. GLICKMAN, Secretary of Agriculture, in his official capacity, Defendant–Appellee.

No. 98–16893.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1999

Filed July 17, 2000

William E. Morris, Arizona Justice Institute, Tucson, Arizona, for the plaintiff-appellant.

Deborah Ruth Kant, United States Department of Justice, Civil Division, Washington, D.C., for the defendant-appellee.

Before: HUG, Chief Judge, WARDLAW, Circuit Judge, and MOSKOWITZ,* District Judge.

WARDLAW, Circuit Judge:

Celia Aleman ("Aleman"), a 62-year-old permanent resident alien, appeals the district court's dismissal of her action challenging a provision of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, 110 Stat. 2105 (1996) (the "Welfare Reform Act" or the "Act"), the application of which denied her food stamps from September of 1997 to November 1, 1998. We conclude that, in determining a permanent resident alien's eligibility for food stamps, the provision at issue, now codified at 8 U.S.C. §§ 1612(a)(2)(B) and 1645, does not irrationally differentiate between marriages that end in divorce and those that end in death. We therefore hold that the challenged provision does not violate the equal protection component of the Due Process Clause of the Fifth Amendment, and we accordingly affirm.

I.

The Food Stamp Act of 1964, 7 U.S.C. § 2011 *et seq.*, established a state-adminis-

---

* The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

tered, federal program to supplement the food purchasing power of low-income households. *See id.* § 2011. Eligibility for participation in the program is determined on a household rather than an individual basis, *see id.* § 2014; 7 C.F.R. § 273.1, and the program is restricted to households with net incomes below the federal poverty level and resources below $2,000 or, if a household member is disabled or age 60 or older, below $3,000, *see* 7 U.S.C. § 2014(c); 7 C.F.R. § 273.8; 7 C.F.R. § 273.9. Once eligible, households receive coupons that may then be used to purchase food from approved retail stores. *See* 7 U.S.C. § 2013(a).

The Welfare Reform Act significantly restricted the eligibility of permanent resident aliens to receive food stamps. In particular, the Act provides that, subject to certain enumerated exceptions, a "qualified alien" is ineligible for food stamps, 8 U.S.C. § 1612(a)(1), and it defines "qualified alien" to include "an alien who is lawfully admitted for permanent residence," *id.* § 1641(b)(1).

At issue in this case is the exception to this general prohibition now codified at 8 U.S.C. § 1612(a)(2)(B) (the "qualifying-quarters provision"). This exception provides that food stamps remain available to a qualified alien who "is lawfully admitted to the United States for permanent residence" and who "has worked 40 qualifying quarters of coverage as defined under Title II of the Social Security Act ... or can be credited with such quarters under [8 U.S.C. § 1645]." *Id.* § 1612(a)(2)(B).[1] Under 8 U.S.C. § 1645, "an alien shall be credited with-(1) all of the qualifying quarters of coverage ... worked by a parent of such alien before the date on which the alien attains age 18, and (2) all of the

qualifying quarters worked by a spouse of such alien during their marriage and the alien remains married to such spouse or such spouse is deceased." *Id.* § 1645. However, "[n]o such qualifying quarter of coverage ... may be credited to an alien ... if the parent or spouse (as the case may be) of such alien received any Federal means-tested public benefit ... during the period for which such qualifying quarter of coverage is credited." *Id.*[2]

Before the enactment of the Welfare Reform Act, Aleman received food stamps as the sole member of her eligible household. As "an alien who is lawfully admitted for permanent residence," however, Aleman is a "qualified alien" under the Act, and because she could not invoke any of the statutory exceptions, the Arizona Department of Economic Security (the "ADES") terminated Aleman's certification for food stamps beginning in September of 1997.

In determining that Aleman no longer qualified for food stamps, the ADES noted that she could not invoke the qualifying-quarters provision. That is, although Aleman was married to Cosme Aleman ("Cosme") from June 6, 1956, to May 8, 1975, and although Cosme worked 40 qualifying quarters during their marriage, the marriage ended in divorce. Thus, Aleman could not be credited with Cosme's quarters under 8 U.S.C. § 1645. Neither could she qualify for food stamps through her parents, who had not worked in covered employment in the United States before Aleman reached the age of 18. Consequently, Aleman, who had not worked 40 qualifying quarters herself, did not retain her eligibility for food stamps under 8 U.S.C. § 1612(a)(2)(B).

---

1. Forty qualifying quarters is equivalent to ten years. *See* 42 U.S.C. § 413.

2. The programs included under the term "Federal means-tested public benefit" are listed at 8 U.S.C. § 1613(c)(2). In the legislative history of the Welfare Reform Act, "Federal means-tested public benefit" is defined as "a public benefit (including cash, medical, housing, and food assistance and social services)

of the Federal Government in which the eligibility of an individual, household, or family eligibility unit for benefits, or the amount of such benefits, or both are determined on the basis of income, resources, or financial need of the individual, household, or unit." H.R. Conf. Rep. No. 104–725, at 381 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2769 (internal quotation marks omitted).

On January 16, 1998, Aleman filed a complaint in the United States District Court for the District of Arizona against U.S. Secretary of Agriculture Daniel Glickman, in his official capacity ("Secretary Glickman" or "government"), challenging the termination of her food stamps. She asserted that, in determining eligibility for food stamps, the qualifying-quarters provision of the Welfare Reform Act irrationally distinguishes between two otherwise identical classes of lawful residents: (1) "[t]he disadvantaged class, of which plaintiff is a member, all of whom are completely denied necessary credit for quarters of covered employment worked by former spouses during marriages that ended in divorce"; and (2) "[t]he favored class, all of whom are [granted] full credit for documented quarters of covered employment worked by former spouses, during marriages that ended in their deaths." Aleman argued that this classification system violates the equal protection component of the Due Process Clause of the Fifth Amendment, and she prayed for declaratory and injunctive relief.

Five months after Aleman filed her complaint, the President signed into law the Agricultural Research, Extension & Education Reform Act of 1998, Pub.L. No. 105–185, §§ 503–508, 112 Stat. 523 (1998), (the "1998 amendments"). This statute restored food-stamp eligibility for, inter alia, "[d]isabled aliens lawfully residing in the United States on August 22, 1996." 8 U.S.C. 1612(a)(2)(4). Because she meets the statutory definition of "disabled," Aleman satisfied this provision, and, on November 1, 1998, the effective date of the 1998 amendments, she regained her eligibility for food stamps. Thus, after this date, Aleman's claims for prospective relief became moot, and her only remaining claim was for a retroactive award of food stamps for the period during which her benefits were cut off, from September of 1997 to November 1, 1998. *See Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 957 (9th Cir.1999); *see also* 7 U.S.C. § 2023(b) (stating that "any food stamp allotments found to have been wrongfully withheld shall be restored only for periods of not more than one year prior to the date of the commencement of [the judicial] action").

Secretary Glickman moved to dismiss Aleman's complaint under Federal Rule of Civil Procedure 12(b)(6). The government argued that Aleman could not state an equal protection violation because the qualifying-quarters provision is supported by a rational basis.

On August 7, 1998, the district court granted the government's motion. Consistent with Aleman's allegations, the district court stated that the statutory classification at issue was "between those marriages ending in divorce and those ending in death." Because it determined that "no fundamental right or suspect classification [was] involved," and because it found that the challenged statute involved "Congress['s] plenary power to regulate immigration and naturalization," the district court reviewed this classification under the rational basis test. Applying this standard, it found "the provision [to be] rationally related to the legitimate interests of promoting self-sufficiency within a household, minimizing the welfare dollars spent on non-citizens, and discouraging divorce." Accordingly, the district court held that 8 U.S.C. §§ 1612(a)(2)(B) and 1645 did not violate the equal protection component of the Due Process Clause of the Fifth Amendment, and it therefore dismissed Aleman's complaint under Rule 12(b)(6). This appeal followed.

## II.

In resolving Aleman's equal protection challenge, we must first determine what classification has been created by the qualifying-quarters provision. *See Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 906 n. 6, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (plurality opinion); *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 253, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278,

36 L.Ed.2d 16 (1973); *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). We review de novo the district court's interpretation of this statute. *See Yang,* 183 F.3d at 957.

■ The qualifying-quarters provision allows a permanent resident alien whose spouse has worked 40 qualifying quarters "during their marriage and the alien remains married to such spouse or such spouse is deceased," 8 U.S.C. § 1645, to remain eligible for food stamps. *See id.* § 1612(a)(2)(B). In interpreting this language, we hold, as did the district court, that the relevant statutory classification is between (1) those legal aliens, like Aleman, whose spouse had worked 40 qualifying quarters during a marriage that ended in divorce, and (2) those legal aliens whose spouse had worked 40 qualifying quarters during a marriage that ended in death. Under the Welfare Reform Act, this second group of aliens (the widowed spouses) is eligible for food stamps, but the first group (the divorced spouses) is not.

■ In her brief,[3] Aleman takes issue with this classification, arguing that "[t]he fact of [a worker-spouse's] death is wholly sufficient, under [8 U.S.C. § 1645], to entitle [a permanent resident alien] to credit for [the worker-spouse's] quarters of covered employment during their marriage-*regardless of whether or not the marriage itself ended with the worker's death.*" In other words, as Aleman's brief urges, the relevant statutory classification created by the qualifying-quarters provision is actually between (1) those legal aliens (who are ineligible for food stamps and who include Aleman) whose spouses worked 40 qualifying quarters *during marriages that ended in divorce and whose now ex-spouses are*

*still alive,* and (2) those legal aliens (who are eligible for food stamps) whose spouses worked 40 qualifying quarters *during marriages that ended in divorce and whose now ex-spouses are deceased.*

We reject this interpretation because it conflicts with an Act of Congress, with the Department of Agriculture's formal regulations implementing the food-stamp program, and with the Department's informal guidelines on the qualifying-quarters provision. In specific, 1 U.S.C. § 7 provides that "[i]n determining the meaning of any Act of Congress, ... the word 'spouse' refers only to a person of the opposite sex who *is* a husband or a wife." 1 U.S.C. § 7 (emphasis added). Similarly, in 7 C.F.R. § 271.2, the Department of Agriculture defines "spouse" in the present tense for the purposes of the food-stamp program. *See* 7 C.F.R. § 271.2; *see also Christensen v. Harris County,* —— U.S. ——, ——, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000) (noting that under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), "a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute"). Accordingly, under the controlling definition of "spouse," the relevant statutory language "such spouse is deceased," 8 U.S.C. § 1645, means, more precisely, "such spouse is deceased *and, at death, such spouse was the alien's current spouse.*"

■ Moreover, in guidelines sent to the states, the Department of Agriculture has expressly rejected the interpretation that Aleman proposes in her brief. It has instead interpreted the qualifying-quarters

---

**3.** At oral argument, Aleman's counsel accepted the district court's (and the government's) interpretation of the qualifying-quarters provision "for the purposes of this argument." We must look beyond this concession, however. "[W]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper con-

struction of governing law." *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)) (internal quotation marks omitted). Accordingly, to determine the correct construction of this statute, we will examine the argument raised in Aleman's brief.

provision to mean that "[a] former spouse's quarters cannot be credited if the marriage ended, unless by death." Food & Nutrition Serv., U.S. Dep't of Agric., *Cumulative Questions and Answers on Certification and Work Issues in PRWORA* (current as of July 1999) [hereinafter USDA Guidelines].[4] Although this agency enforcement guideline "do[es] not warrant *Chevron*-style deference," *Christensen, —— U.S. at ——*, 120 S.Ct. at 1662, the Department of Agriculture's interpretation of the statute is nonetheless "entitled to respect," *id.* at ——, 120 S.Ct. at 1663 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)) (internal quotation marks omitted); *see also Skidmore*, 323 U.S. at 140, 65 S.Ct. 161 (holding that "the rulings, interpretations and opinions of" an agency, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance"), and, given the aforementioned definition of "spouse" that governs here, it persuades us, *see id.* (noting that an agency's informal interpretation of a statute possesses "power to persuade, if lacking power to control").

We conclude that the relevant statutory classification here presented is between (1) those permanent resident aliens whose spouse had worked 40 qualifying quarters during a marriage that ended in divorce, and who were therefore ineligible for food stamps, and (2) those permanent resident aliens whose spouse had worked 40 qualifying quarters during a marriage that ended in death, and who were therefore eligible for food stamps.

### III.

■ Having resolved the preliminary issue of statutory interpretation, we must next ascertain the appropriate level of scrutiny to employ in evaluating Aleman's equal protection challenge. Because the federal statutory classification at issue in this case discriminates among aliens in the distribution of welfare benefits, we find that the Supreme Court's decision in *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), controls our analysis, and, accordingly, we hold that the classification is subject to rational basis review. *See id.* at 82–83, 96 S.Ct. 1883; *see also Sudomir v. McMahon*, 767 F.2d 1456, 1464 (9th Cir.1985) (holding that "[f]ederal classifications distinguishing among groups of aliens ... are valid unless 'wholly irrational.' " (quoting *Diaz*, 426 U.S. at 83, 96 S.Ct. 1883)).

In *Diaz*, the Supreme Court upheld the constitutionality of a provision of the Social Security Act that restricted aliens' eligibility for the Medicare Part B medical-insurance program based on their continuous residence in the United States for five years and their admission to the country for permanent residence. *See Diaz*, 426 U.S. at 69–70, 96 S.Ct. 1883. There, as here, the challenged legislation "discriminat[ed] within the class of aliens[,] allowing benefits to some aliens but not to others." *Id.* at 80, 96 S.Ct. 1883. In evaluating this legislation, the *Diaz* Court emphasized that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government," and it therefore held that "a narrow standard of review [applied to] decisions made by the Congress or the President in the area of immigration and naturalization." *Id.* at 81–82, 96 S.Ct. 1883. Applying this narrow standard, the Court found that the statutory classification at issue did not violate equal protection because it was not "wholly irrational." *Id.* at 83, 96 S.Ct. 1883. We have since equated *Diaz*'s "wholly irrational" standard with the rational basis test. *See United States v. Lopez–Flores*, 63 F.3d 1468, 1473 (9th Cir.1995) (stating that "judicial scrutiny of [federal] alienage classifications is relaxed

---

4. These guidelines are available at http://www.fns.usda.gov/fsp/menu/admin/welfare/section402.htm.

to a 'rational basis' standard") (citing *Diaz*, 426 U.S. at 83, 96 S.Ct. 1883); *Garberding v. INS*, 30 F.3d 1187, 1190–91 (9th Cir. 1994) (holding that because "there is no rational basis for treating Garberding differently," the INS's "singling her out for deportation is wholly irrational" under *Diaz*); *Sudomir*, 767 F.2d at 1464; *see also City of Chicago v. Shalala*, 189 F.3d 598, 604 (7th Cir.1999) ("Although the [*Diaz*] Court did not adopt explicitly the 'rational basis' standard of scrutiny, it in effect applied rational basis review ...."), *cert. denied*, —— U.S. ——, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000); *Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1347 (11th Cir.1999) (noting that *Diaz*'s "wholly irrational" standard "is merely another way of stating the rational basis test").

When previously faced with a federal classification among aliens in the distribution of welfare benefits, we found *Diaz* dispositive as to the appropriate level of judicial review. *See Sudomir*, 767 F.2d at 1464 (following *Diaz* and applying the rational basis test to an equal protection challenge to a provision of the Social Security Act that excluded asylum applicants but not other legal aliens from participation in the Aid to Families with Dependent Children (AFDC) program). Moreover, although no court has previously addressed the precise statutory classification at issue in this case, two circuits have applied *Diaz*'s rational basis test to more general equal protection attacks by legal aliens against the Welfare Reform Act. *See City of Chicago v. Shalala*, 189 F.3d at 604 (concluding that "under *Diaz*, the provisions of the Welfare Reform Act at issue in this case must be reviewed under rational basis scrutiny"); *Rodriguez*, 169 F.3d at 1350 (holding that "[*Diaz*] dictates that we apply rational basis scrutiny to the classifications Congress has drawn in 8 U.S.C. § 1612"); *see also Kiev v. Glickman*, 991 F.Supp. 1090, 1099 (D.Minn. 1998) (applying the rational basis test to an equal protection challenge brought by permanent resident aliens against 8 U.S.C. § 1612); *Abreu v. Callahan*, 971 F.Supp. 799, 815 (S.D.N.Y.1997) (same).

Despite this authority, Aleman presents several arguments why the standard of review articulated in *Diaz* should not apply. We reject each in turn.

First, Aleman contends that unlike in *Diaz*, where the classification among aliens "served the indispensable objective of identifying [permanent resident aliens] whose ties to the United States ... were sufficiently like those of citizens," in this case, "affinity with the United States ... is not even remotely an issue." This argument, however, "fails to address the relevant issue." *Rodriguez*, 169 F.3d at 1348. As the Eleventh Circuit recently stated, "nothing in [*Diaz*] indicates that the Court meant to hold that the only statutes subject to rational basis scrutiny are those that are based on the same distinguishing factor used in that statute, i.e., length of residency." *Id.*

Relying on the Supreme Court's decisions in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), and *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978), Aleman also argues that because "food stamps ... are sufficiently critical to a needy, lawful resident's tolerable existence in the United States ... their denial to a discrete class of long time, lawful residents ... demands more than [*Diaz*'s] thoroughly deferential scrutiny." *Plyler* and *Foley* are inapposite, however, because they involved *state* classifications of aliens. *See Plyler*, 457 U.S. at 205, 225, 102 S.Ct. 2382; *Foley*, 435 U.S. at 292, 294–95, 98 S.Ct. 1067. As the Seventh Circuit noted in rejecting a similar challenge to the Welfare Reform Act, "the *Plyler* case involved a state law, and nothing in the Court's opinion suggests that *Diaz* would not apply (or that heightened scrutiny would apply) if the law were federal." *City of Chicago v. Shalala*, 189 F.3d at 605; *accord Rodriguez*, 169 F.3d at 1349–50 ("Nothing in *Plyler* even arguably suggests that a heightened level of scrutiny would have applied if the chal-

lenged statute had been enacted by Congress...."); *Abreu*, 971 F.Supp. at 813 (noting the same); *see also Sudomir*, 767 F.2d at 1466 (finding *Plyler* inapplicable to a federal classification among aliens in the distribution of welfare benefits). This same analysis applies to *Foley*. *See Kiev*, 991 F.Supp. at 1098–99 (stating that such reliance on *Foley* "ignores those essential reasons that have distinguished state alienage classifications from similar federal classifications"); *Rodriguez v. United States*, 983 F.Supp. 1445, 1456–57 (S.D.Fla. 1997) ("*Foley* and *Plyler* acknowledge that a heightened standard of review is applicable when state, rather than federal, alienage laws are at issue."), *aff'd*, 169 F.3d 1342 (11th Cir.1999).[5]

Furthermore, Aleman asserts that although *Diaz*'s rational basis test applies to statutes enacted under Congress's plenary power over immigration and naturalization, *Diaz* does not establish the appropriate level of scrutiny for the qualifying-quarters provision, which is "unrelated to any incident of alienage." *Accord* 1 Laurence H. Tribe, *American Constitutional Law*, § 5–18, at 975 (3d ed. 2000) ("Outside the context of entry, stay, and naturalization, congressional authority to regulate the activities of aliens, and to draw lines both between aliens and citizens and among aliens in the distribution of benefits, loses its clear connection to considerations of national sovereignty and foreign policy; outside those limited contexts courts should thus feel freer to limit congressional power ...." (footnote omitted)). Although this argument may have some logical merit, it is foreclosed by *Diaz*. *See Kiev*, 991 F.Supp. at 1096 ("Were this Court addressing the issue on a 'clean state,' such an argument may have mer-

it.... However, ... the slate is not clean."); *see also City of Chicago v. Shalala*, 189 F.3d at 604–05 (holding that "the Court's analysis in *Diaz* makes clear that, for purposes of equal protection analysis, Congress' interest in regulating the relationship between our alien visitors and the national government ought not to be defined in such narrow terms as to preclude application of the rational basis test in a case ... involving eligibility for government benefits"); *Rodriguez*, 169 F.3d at 1349 (noting that the *Diaz* Court "rejected [a] narrow view of Congress' sovereign immigration power"). In fact, *Diaz* "specifically held that a statute discriminating among aliens in the provision of Medicare, a form of welfare benefits, does lie within Congress' power 'in the area of immigration and naturalization,' and for that reason is subject to rational basis scrutiny." *Id.* at 1349 (quoting *Diaz*, 426 U.S. at 82, 96 S.Ct. 1883); *accord City of Chicago v. Shalala*, 189 F.3d at 605 (pointing out that *Diaz* "characteriz[ed] Congress' decision to restrict certain aliens' eligibility for welfare benefits as a decision 'in the area of immigration and naturalization'"). Therefore, as to the applicable level of scrutiny, we find it "impossible to distinguish [the qualifying-quarters provision], which also discriminates among aliens in the provision of welfare benefits, from the statute at issue in [*Diaz*]." *Rodriguez*, 169 F.3d at 1349; *accord City of Chicago v. Shalala*, 189 F.3d at 605.

Finally, Aleman argues that the qualifying-quarters provision infringes upon the fundamental right to marry and is therefore subject to strict scrutiny analysis. *See Zablocki v. Redhail*, 434 U.S. 374, 386–88, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)

---

**5.** In *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051 (D.C.Cir.1993), the D.C. Circuit appeared to indicate that, pursuant to *Foley*, it would apply strict scrutiny to a federal statute that denied food stamps to aliens. *See id.* at 1056 n. 3. Because of the fundamental distinction between state and federal alienage classifications, *see Diaz*, 426 U.S. at 84–85, 96 S.Ct. 1883 (noting that "equal protection analysis ... involves significantly dif-

ferent considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government"), however, this dicta by the *Moving Phones* court has not persuaded courts considering the Welfare Reform Act. *See Kiev*, 991 F.Supp. at 1099; *Rodriguez*, 983 F.Supp. at 1457. Neither does it persuade us.

(holding that a statutory classification that "interfere[s] directly and substantially with the right to marry" "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests"). Aleman urges that the provision impermissibly interferes with the marital relationship by eliminating certain legal aliens' eligibility for food stamps upon divorce, thus making the dissolution of these marriages more expensive. *See Boddie v. Connecticut*, 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (finding that a state law requiring the payment of filing fees and court costs in order to receive a divorce touched upon indigent individuals' fundamental right to marry); *see also Zablocki*, 434 U.S. at 374 n. 10, 98 S.Ct. 673 ("The denial of access to the judicial forum in *Boddie* touched directly ... on the marital relationship and on the associational interests that surround the establishment and dissolution of that relationship." (omission in original) (quoting *United States v. Kras*, 409 U.S. 434, 444, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973)) (internal quotation marks omitted)).

We need not decide whether *Diaz*'s rational basis test would control in a case in which the statutory classification actually infringed upon an alien's fundamental right to marry, however, because the qualifying-quarters provision does not "interfere directly and substantially with the right to marry." *Id.* at 387, 98 S.Ct. 673 (noting that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed"). The Supreme Court has previously reviewed equal protection challenges to provisions of the Social Security Act that, like the qualifying-quarters provision, discriminate on the basis of divorce in their allocation of federal benefits, under the rational basis standard. *See Bowen v. Owens*, 476 U.S. 340, 345–49, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986) (noting that a court should not disturb Congress's decision in this context unless "the distinctions [it] made were arbitrary or irrational"); *Mathews v. de Castro*, 429

U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976) (same); *see also Zablocki*, 434 U.S. at 387 n. 12, 98 S.Ct. 673 (distinguishing *Califano v. Jobst*, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977), another social-security case in which the challenged statute discriminated on the basis of marital status, because "[t]he Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and ... there was no evidence that the laws significantly discouraged, let alone made 'practically impossible,' any marriages"); *cf. Sosna v. Iowa*, 419 U.S. 393, 410, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ("The operation of the filing fee in *Boddie* served to exclude forever a certain segment of the population from obtaining a divorce in the courts of Connecticut.").

Thus, in all relevant respects, *Diaz* is indistinguishable from the present case. Because *Diaz* sets forth the applicable standard of review, we now examine whether the classification created by the qualifying-quarters provision is supported by a rational basis.

## IV.

■■■ "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Therefore, "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity" and must be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 319–20, 113 S.Ct. 2096. Furthermore, "a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Id.* at 320, 113 S.Ct. 2096 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1

(1992)). Rather, "a statutory classification ... must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096. In addition, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification"; "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller*, 509 U.S. at 320, 113 S.Ct. 2637. "Finally, courts are compelled under rational-basis review 'to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 321, 113 S.Ct. 2637 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)).

█ To reiterate, the relevant statutory classification in this case is between (1) those permanent resident aliens, like Aleman, whose spouse had worked 40 qualifying quarters during a marriage that ended in divorce, and who were therefore ineligible for food stamps and (2) those permanent resident aliens whose spouse had worked 40 qualifying quarters during a marriage that ended in death, and who were therefore eligible for food stamps. Although this classification is not a model of legislative logic and, as in this case, can operate quite harshly to deprive deserving persons of the means of subsistence, we are compelled to conclude that it survives the exceedingly low level of judicial scrutiny mandated by the rational basis test.

### A.

Although neither circuit confronted the particular classification at issue in this case, both the Seventh and Eleventh Circuits have found a rational basis for 8 U.S.C. § 1612(a)(2)(B). *See City of Chicago v. Shalala*, 189 F.3d at 609 & n. 15; *Rodriguez*, 169 F.3d at 1351. As both circuits explained, this statutory provision

"extend[s] benefits to aliens who have made special contributions to this country," *id.; accord Shalala*, 189 F.3d at 609, and "[i]t certainly is not irrational for Congress to reward such service or to encourage other aliens to make similar contributions in the future," *id.; accord Rodriguez*, 169 F.3d at 1351. Building upon the reasoning of these circuits, we hold that, although the distinction may appear arbitrary, it is not irrational for Congress to reward widowed aliens for these "special contributions," while denying the same benefit to divorced aliens.

The Supreme Court has twice addressed statutory classifications that, like the classification at issue in this case, discriminate against divorcees in the allocation of federal benefits. On both occasions, the Court held that these classifications in the context of the Social Security Act survived the rational basis standard of review.

First, in *Mathews v. de Castro*, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976), the Supreme Court examined a provision in the Social Security Act that provided benefits to a married woman whose husband retires or becomes disabled, but not to a divorced woman whose former husband retires or becomes disabled. *See id.* at 182–83, 97 S.Ct. 431. In upholding this distinction against an equal protection challenge, the *de Castro* Court noted that "[d]ivorce by its nature works a drastic change in the economic and personal relationship between a husband and wife" and that "divorced couples typically live separate lives." *Id.* at 188–89, 97 S.Ct. 431. In the Court's words, "Congress could have rationally assumed that divorced husbands and wives depend less on each other for financial and other support than do couples who stay married." *Id.* at 188, 97 S.Ct. 431. Ten years later, in *Bowen v. Owens*, 476 U.S. 340, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986), the Supreme Court upheld a distinction in the Social Security Act that provided survivor's benefits to a widowed spouse, but not to a similarly situated divorced spouse. *See id.* at 341–42, 350, 106 S.Ct. 1881. In doing so, the *Owens* Court reiterated the reasoning of

*de Castro*, stating that "divorce normally reduces dependency on the wage earner." *Id.* at 350, 106 S.Ct. 1881.

Aleman attempts to distinguish *de Castro* and *Owens*. She points out that "[u]nlike the Social Security Act, the Food Stamp Act is, at bottom, exclusively concerned with the urgent want of program beneficiaries." Indeed, the *de Castro* Court itself stated that the aspects of the Social Security system it was addressing "do not purport to be general public assistance laws that simply pay money to those who need it most." *De Castro*, 429 U.S. at 185, 97 S.Ct. 431. Moreover, the Supreme Court recognized that different considerations might prevail "in a case involving a constitutional attack on a statute that gave monetary benefits to women based on their overall general need." *Id.* at 187, 97 S.Ct. 431.

Despite Aleman's arguments, however, the qualifying-quarters provision, as opposed to the food-stamp program generally, is not strictly a need-based program. Rather, it, in relevant part, grants food-stamp eligibility to one spouse based on the past efforts of the other spouse. In this regard, the qualifying-quarters provision is essentially indistinguishable from the statutes at issue in *de Castro* and *Owens*. To be more precise, both *de Castro* and *Owens* dealt with insurance programs and the question whether a divorcee was entitled to benefits earned by the past work of an ex-spouse. *See Owens*, 476 U.S. at 341–42, 349–50, 106 S.Ct. 1881; *de Castro*, 429 U.S. at 182–83, 188–89, 97 S.Ct. 431. Here, we deal with what is, in all relevant respects, an identical issue: whether Aleman, a divorcee, is entitled to food-stamp eligibility based on her ex-husband's 40 quarters of past work.[6]

In sum, we agree with the Seventh and Eleventh Circuits that Congress could rationally enact the qualifying-quarters provision as a reward to a legal alien for his past work in this country. Moreover, as the Supreme Court held in *de Castro* and *Owens*, Congress could rationally assume that divorced spouses depend less on a wage-earning ex-spouse than widowed spouses depend on a deceased spouse. Therefore, it was not "wholly irrational" for Congress to deny the reward of food stamp eligibility to divorcees, like Aleman, who have a separate financial and legal existence from those the reward is supposed to benefit, the spouse who has worked the 40 quarters.[7]

---

6. There is, of course, one obvious difference between *de Castro* and *Owens* and the present case. Unlike the legislation at issue in *de Castro* and *Owens*, the qualifying-quarters provision discriminates on the basis of alienage. That is, all else being equal, if Aleman were a United States citizen, she would qualify for food stamps. This difference does not affect the outcome of Aleman's case, however. *See Diaz*, 426 U.S. at 78, 96 S.Ct. 1883 (noting that "a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded the other") & n. 12 ("The whole of Title 8 of the United States Code, regulating aliens and nationality, is founded on the legitimacy of distinguishing between citizens and aliens."), 80 ("The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'"), 82 (finding "it ... obvious that Congress has no constitutional duty to provide all aliens with the welfare benefits provided to citizens"); *City of Chicago v. Shalala*, 189 F.3d at 606 (noting

that "Congress stated that the [Welfare Reform] Act's provisions are intended to foster the legitimate governmental purpose of encouraging aliens' self-sufficiency"); *Rodriguez*, 169 F.3d at 1351; *see also* 8 U.S.C. § 1601 (setting forth Congress's stated policy reasons for enacting the Welfare Reform Act).

7. Aleman points out in her brief that a legal alien over the age of 18 can claim credit for quarters worked by his parents before the alien reached age 18, even if the now-adult alien leads a life completely independent of his parents. *See* USDA Guidelines, *supra* (noting that "an alien of any age" can claim credit for his parent's quarters before the alien reaches age 18). However, we do not find it "wholly irrational" for Congress to believe that, as a class, children of any age are more dependent on their parents than divorcees are on their ex-spouses. *See Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096 (holding that "a statutory classification ... must be upheld against equal protection challenge if there is any reasonably conceiva-

## B.

■ We also conclude the qualifying-quarters provision is rationally related to the legitimate governmental purpose of limiting expenditures on public-benefit programs.

In *Diaz*, the Supreme Court found that "maintaining ... fiscal integrity" was a legitimate purpose for Congress to pursue in limiting the number of aliens eligible for Medicare benefits. *Diaz*, 426 U.S. at 83 n. 22, 96 S.Ct. 1883; *see also Rodriguez*, 169 F.3d at 1351 (explaining *Diaz* in this manner and upholding the Welfare Reform Act, under *Diaz*, because it "is rationally related to the legitimate purpose of achieving cost savings"). We have similarly held that "concern about the fiscal impact of providing ... benefits ... is a legitimate government objective." *Sims v. Harris*, 607 F.2d 1253, 1257 (9th Cir.1979) (Kennedy, J.); *see also City of Chicago v. Shalala*, 189 F.3d at 607 ("[W]e cannot say that it was irrational for Congress to decide to achieve its budget objectives by eliminating aliens from these [federal benefit] programs."); *Rodriguez*, 169 F.3d at 1350–51 (noting the same).

Providing food stamps to widowed aliens but not to divorced aliens serves this cost-saving end. That is, under the qualifying-quarters provision, when a marriage ends in death, only one household, the surviving spouse's, remains eligible for food stamps. Similarly, when a marriage ends in divorce, only one household, the worker-spouse's, retains food-stamp eligibility. Specifically, under the food-stamp program, one 2–person household can receive a maximum monthly benefit of $234.00, whereas two 1–person households can receive a combined maximum monthly benefit of $254.00. *See* Food & Nutrition Serv., U.S. Dep't of Agriculture, *Allotment Chart*

(effective from Oct. 1999 to Sept. 30, 2000).[8] Congress thus took the legitimate approach of tracking the qualifying-quarter-earner's household to avoid duplicate expenditure of resources, including administrative costs. If the government departed from this approach and allowed divorcees like Aleman to keep their food-stamp eligibility, it would double the number of potentially eligible households and thereby increase the cost of the program. Therefore, all else being equal, limiting the number of households potentially eligible for food stamps, which the qualifying quarters provision does, conserves government resources. *See id.*

■ "[T]he mere fact that a classification saves money because it does not extend benefits to some people, by itself, does not demonstrate the classification's rationality." *Sims*, 607 F.2d at 1257 n. 4. As noted above, however, the distribution of food stamps through the qualifying-quarters provision is a reward to those aliens who have made "special contributions to the United States." *Rodriguez*, 169 F.3d at 1351; *accord City of Chicago v. Shalala*, 189 F.3d at 609. Certainly it is not irrational for Congress to determine it can save money by granting only one reward of food stamps for each "special contribution," and, because food stamps are allocated on a household basis, *see, e.g.*, 7 U.S.C. § 2013 (authorizing "a food stamp program under which ... eligible *households* within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment" (emphasis added)), one reward of food stamps logically means providing one household with food stamps. *See id.; see also City of Chicago v. Shalala*, 189 F.3d at 608 ("Congress was entitled to conclude that achieving savings by elimi-

---

ble state of facts that could provide a rational basis for the classification").

**8.** This information, listing the maximum monthly allotments that households of various

sizes may receive under the food-stamp program, is available at http://www.fns.usda.gov/fsp/charts/allotmentchart.htm

nating these benefits to aliens was sufficiently compatible with the other policy objectives that it sought to foster through this legislation."). Because the classification in 8 U.S.C. §§ 1612(a)(2)(B) and 1645 limits the number of food-stamp-eligible households in this manner,[9] it is rationally related to the legitimate congressional purpose of achieving cost savings in the food-stamp program.[10]

## V.

For the foregoing reasons, we hold that the statutory classification at issue does not violate the equal protection component of the Due Process Clause of the Fifth Amendment, and, accordingly, the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is AFFIRMED.

---

9. As a practical matter, under the qualifying-quarters provision, more than one household could gain food-stamp eligibility from the work of one alien. For example, if a husband and wife live in separate households, the government concedes that both households could be eligible for food stamps. However, as the Supreme Court has repeatedly made clear, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321, 113 S.Ct. 2637. Moreover, this statutory distinction between divorced aliens and separated aliens can be justified under the first rational basis discussed above. *See infra* Part IV.A.

10. The district court also held that the qualifying-quarters provision was rationally related to the legitimate purpose of "discouraging divorce." The government does not raise this argument on appeal, and we do not rely on "discouraging divorce" as a rational basis. Because one has a fundamental right to marry, *see Zablocki*, 434 U.S. at 386, 98 S.Ct. 673, which includes the right to divorce so that one can remarry, *see Boddie*, 401 U.S. at 376, 91 S.Ct. 780, a statute whose only purpose is to hinder this right, even if it does not actually, in its effect, "interfere directly and substantially with the right to marry," *Zablocki*, 434 U.S. at 387, 98 S.Ct. 673, would not be supported by a legitimate government purpose. *Cf. Planned Parenthood v. Casey*, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.) ("A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not to hinder it.").