**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 12 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

VALENTIN SOSKIN, BEI DEI
HOWE, EVA ROSENTHAL,
VATCHAGAN TATEVOSIAN,
GINDA K. GELFAND, YAKOV
GELFAND, DUBALE SHIBESHI,
SARIN PERLMAN, on their own
behalf and on behalf of all others
similarly situated,

      Plaintiffs-Appellants,

  v.

KAREN REINERTSON, in her
official capacity as Executive Director
of the Colorado Department of Health
Care Policy and Financing,

      Defendant-Appellee.

UNITED STATES OF AMERICA,

      Intervenor.

No. 03-1162

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 03-RB-529 (BNB))**

---

Lucas Guttentag, American Civil Liberties Union, Immigrants' Rights Project,
Oakland, California; Marc Cohan, Welfare Law Center, Inc., New York,
New York (Mary R. Mannix, Anne H. Pearson, and Rebecca L. Scharf, Welfare
Law Center, Inc., New York, New York; Mark Silverstein, American Civil
Liberties Union Foundation of Colorado, Denver, Colorado; Gregory Piché, Scott

Barker and Stephen Masciocchi, Holland & Hart LLP, Denver, Colorado; Linton Joaquin and Gabrielle Lessard, National Immigration Law Center, Los Angeles, California; Tanya Broder, National Immigration Law Center, Oakland, California; Jane Perkins, National Health Law Program, Chapel Hill, North Carolina, with them on the briefs), for Plaintiffs-Appellants.

Terence P. (Renny) Fagan, Deputy Attorney General (Ken Salazar, Attorney General, Ann Hause, First Assistant Attorney General, and Ilene I. Wolf Moore, Assistant Attorney General, with him on the briefs), Denver, Colorado, for Defendant-Appellee.

Robert D. McCallum, Jr., Assistant Attorney General; John W. Suthers, United States Attorney, Denver, Colorado; Thomas M. Bondy and Eric D. Miller, Attorneys, Appellate Staff Civil Division, United States Department of Justice, Washington, D.C., on the brief for Intervenor.

---

Before **KELLY**, **HENRY**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Plaintiffs represent a class of legal aliens who will lose their Medicaid benefits when last year's Colorado Senate Bill 03–176 (SB 03–176) takes effect. They contend that the eligibility requirements of SB 03–176 violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and that the state's procedures for terminating benefits violate Medicaid law and the Due Process Clause of the Fourteenth Amendment. The district court denied Plaintiffs' motion for a preliminary injunction against implementation of SB 03–176. We granted an injunction pending resolution of this appeal. We now

-2-

reject Plaintiffs' contentions except that we agree that the state's procedures violate the Medicaid Act in denying some members of the class a right to a hearing. Accordingly, we vacate our injunction, and we affirm in part and reverse in part the district court's denial of a preliminary injunction.

## I. BACKGROUND

### A. Medicaid

Prior to the enactment of SB 03–176, which was signed into law on March 5, 2003, and scheduled to take effect on April 1, 2003, Colorado provided optional Medicaid coverage to all legal aliens eligible under federal law to receive such coverage. The new statute would repeal optional Medicaid coverage, terminating Medicaid benefits to approximately 3,500 aliens residing in Colorado.

Medicaid is a joint state and federal medical assistance program for the poor, disabled, and others in need. 42 U.S.C. § 1396 *et seq.* It provides coverage for such medical services as inpatient and outpatient hospital care, physicians' services, prescriptions, home health care services, and nursing home care. *Id.* §§ 1396a(a)(10)(A), 1396d(a)(1)–(5), (17) & (20). Although states are not required to participate in Medicaid, if a state does elect to participate, it must comply with the minimum requirements of the federal Medicaid Act in order to receive federal matching funds. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). States implement their Medicaid programs in accordance with comprehensive written plans that must be submitted to and approved by the

Secretary of the United States Department of Health and Human Services. *See* 42 U.S.C. § 1396. Colorado has opted to participate in the Medicaid program, and has designated the Department of Health Care Policy and Financing (the Colorado Department), currently headed by Defendant Karen Reinertson (sued here in her official capacity), as the single state agency responsible for administering Medicaid. *See* Colo. Rev. Stat. § 26–4–104(1).

Federal law requires participating states to provide full Medicaid services to all individuals designated as categorically needy. 42 U.S.C. § 1396a(a)(10)(A)(i). States have discretion to provide full Medicaid coverage to additional "optional" segments of the population. *Id.* § 1396a(a)(10)(A)(ii). Emergency care must be provided to all individuals in need of such services. 8 U.S.C. § 1611(b)(1)(A).

In 1996 Medicaid law changed significantly. The federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996) (often referred to as the Welfare Reform Act), was enacted. Explaining the purpose of the provisions with respect to aliens, the Act states:

> The Congress makes the following statements concerning national policy with respect to welfare and immigration:
>
> (1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.
>
> (2) It continues to be the immigration policy of the United States

that--

 (A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

 (B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

8 U.S.C. § 1601(1)–(7).

The PRWORA imposes several limitations on the availability of Medicaid benefits to aliens. 8 U.S.C. § 1601 *et seq*; *id.* § 1612(b)(3)(C). Prior to the PRWORA, Medicaid benefits were mandated for otherwise qualified aliens who

were lawfully admitted for permanent residence or otherwise permanently residing in the United States. *See* 42 C.F.R. § 435.406(a) (1990). Now, the PRWORA requires states to provide Medicaid coverage only to "qualified aliens," which it defines as lawful permanent residents, refugees, aliens granted asylum, and certain other specified categories of lawfully present aliens. 8 U.S.C. § 1612(b); *id.* § 1641(b). The PRWORA also provides that most of these qualified aliens are ineligible for Medicaid benefits until they have lived in the United States for at least five years. *Id*. § 1613. But the five-year requirement does not apply to certain qualified aliens, such as lawful permanent residents who have worked in the United States for 40 qualifying quarters, veterans, and active-duty members of the military. *Id.* § 1612(b)(2). Nor does the requirement apply to qualified aliens who entered the United States prior to August 22, 1996. *Id.* § 1613(a).

The PRWORA does, however, allow states to provide optional Medicaid coverage to legal aliens not included within Congress's definition of "qualified aliens." *Id.* § 1612(b). In essence, states may redefine "qualified aliens" to cover additional legal aliens, so long as they do not cover those aliens explicitly excluded by the PRWORA (e.g., most aliens who have not lived in the United States for five years). *Id.*

Initially Colorado opted to provide coverage beyond that mandated by the PRWORA. In 1997 Colorado responded to the PRWORA by enacting legislation

that maintained the optional Medicaid coverage it had previously provided to all lawfully present aliens who were otherwise eligible. *See* 1997 Colo. Sess. Laws 1257-58. But Colorado policy changed in March of 2003. Faced with an enormous budget shortfall, the state looked to its Medicaid program for savings. The Colorado legislature passed and the governor signed SB 03–176, which removed the optional Medicaid coverage Colorado had been providing to legal aliens. SB 03–176 § 1. After SB 03–176 takes effect, only those aliens that Congress defined in the PRWORA as "qualified aliens" will be eligible for Medicaid in Colorado. SB 03–176 § 2; Colo. Rev. Stat. § 26-4-201(2)(a)–(b). The state estimates that it will save $5.9 million annually by eliminating optional alien coverage.

## B. Coverage Termination Procedures

In Colorado the county departments of social services make the initial Medicaid eligibility determinations. Colo. Rev. Stat. § 26-4-106(1)(a). Accordingly, in anticipation of enactment of SB 03-176, the Colorado Department notified the state's 64 counties of the impending Medicaid eligibility changes and instructed them on procedures to use in effectuating those changes.

First, the Department sent the counties two letters, informing them that SB 03–176 was moving through the legislative process and that the Department would keep them informed as the legislation progressed. Then, after the legislation was passed by the legislature but before it was signed by the Governor,

the Department sent a third, more-detailed letter. The letter, labeled HCFP 03-001, set forth an eligibility redetermination process providing for county officials to ascertain whether individuals whose Medicaid eligibility was eliminated by SB 03-176 could qualify under a different eligibility category.

Five days after the HCFP 03-001 letter was sent to the counties, a statewide conference call was conducted to discuss the letter. Forty counties participated in the conference call. Once the governor signed the bill, the Colorado Department notified the counties and instructed them to provide notice to affected recipients. The counties were directed to provide at least 10 days' notice prior to termination of benefits for all individuals losing coverage as a result of SB 03–176.

**C. Procedural History**

On March 27, 2003, Plaintiffs filed this class-action lawsuit to enjoin the implementation of SB 03–176. Class members include legal aliens who rely on Medicaid to cover important medical services, including chemotherapy, nursing home care, home health care, surgical care, and life-sustaining prescription drug coverage. Without Medicaid, Plaintiffs claim, they will be unable to afford these necessary services and will suffer serious injuries and irreparable harm. Plaintiffs contend that in some cases the loss of medical care could be life threatening.

Plaintiffs' suit seeks a judgment declaring that SB 03–176's eligibility requirements violate the Equal Protection Clause of the Fourteenth Amendment because they discriminate against legal aliens, and that Defendant's procedures

for terminating benefits are inadequate under Medicaid law and the Due Process

Clause of the Fourteenth Amendment. Plaintiffs also seek an injunction

permanently enjoining termination of benefits under SB 03–176.

The district court granted Plaintiffs' request for a temporary restraining

order, but it later denied their motion for a preliminary injunction and lifted the

temporary restraining order. Plaintiffs then moved this court for an injunction

pending appeal. We granted that motion and expedited the appeal. *See Soskin v.*

*Reinertson*, No. 03-1162 (10th Cir. April 25, 2003) (order granting injunction

pending appeal). After oral argument we notified the Attorney General of the

United States, in accordance with Fed. R. App. P. 44, that this case called into

question the constitutionality of an Act of Congress, 8 U.S.C. § 1612(b) (which

authorizes states to reduce Medicaid coverage to aliens). The United States filed

a brief in support of the constitutionality of the statute.

## II. DISCUSSION

We have jurisdiction under 28 U.S.C. § 1292. We

> review[] a district court's grant or denial of a preliminary injunction
> for an abuse of discretion. A district court abuses its discretion
> where it commits a legal error or relies on clearly erroneous factual
> findings, or where there is no rational basis in the evidence for its
> ruling. We examine the district court's underlying factual findings
> for clear error, and its legal determinations *de novo.*

*Davis v. Mineta*, 302 F.3d 1104, 1110-11 (10th Cir. 2002) (internal citations and

quotation marks omitted). For Plaintiffs to be entitled to a preliminary injunction,

they must show:

> (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest. If [Plaintiffs] can establish that the latter three requirements tip strongly in [their] favor, the test is modified, and [Plaintiffs] may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.

*Id*. at 1111 (internal citations and quotation marks omitted).

### A.  Equal Protection Claim

The Fourteenth Amendment to the United States Constitution declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Plaintiffs allege that SB 03-176 violates the Equal Protection Clause because it improperly discriminates between citizens and legal aliens. They argue that such discrimination is subject to strict scrutiny, so the statute can be upheld only if it "advance[s] a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Defendant disputes that strict scrutiny is the appropriate standard for reviewing the statute. She contends that Congress used its plenary immigration

-10-

powers to enact the PRWORA, and because Colorado was acting in accordance with the PRWORA when it enacted SB 03-176, the more deferential rational-basis test applies. The statute satisfies that test, she argues, because it is rationally related to a legitimate state interest. *See Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985) (under rational-basis standard of review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest").

The parties appear to agree that SB 03-176 would not survive strict scrutiny but would satisfy the rational-basis test. Thus, the constitutionality of SB 03-176 depends on the level of scrutiny to which the law is subject. We turn to Supreme Court precedent for guidance.

### 1. *Graham v. Richardson*

Plaintiffs rely heavily on *Graham v. Richardson*, 403 U.S. 365 (1971), which resolved a consolidated appeal involving two cases arising out of different statutory schemes: one from Arizona and one from Pennsylvania. *Id.* at 366-70. The Arizona statute limited alien eligibility for benefits under federally funded programs for persons who were disabled, in need of old-age assistance, or blind. *Id.* at 367. The state limitation on eligibility for the programs provided: "No person shall be entitled to general assistance who does not meet and maintain the following requirements: 1. Is a citizen of the United States, or has resided in the United States a total of fifteen years." *Id.* (internal quotation marks omitted).

The Pennsylvania statute concerned a welfare program that was not federally funded. It limited state benefits to those Pennsylvania residents who either were citizens of the United States or had filed a declaration of intention to become a citizen. *Id.* at 368.

The Court observed that "the Arizona and Pennsylvania statutes in question create two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country." *Id.* at 371. Regarding the Arizona statute, the Court wrote that "[o]therwise qualified United States citizens living in Arizona are entitled to federally funded categorical assistance benefits without regard to length of national residency, but aliens must have lived in this country for 15 years in order to qualify for aid." *Id.* As for Pennsylvania, the Court said, "United States citizens living in Pennsylvania, unable to meet the requirements for federally funded benefits, may be eligible for state-supported general assistance, but resident aliens as a class are precluded from that assistance." *Id.*

The Court first rejected the states' argument that they could favor United States citizens over aliens in the distribution of welfare benefits. While the Court recognized that "[u]nder traditional equal protection principles, a State retains broad discretion to classify so long as its classification has a reasonable basis," *id.*, it was well established "that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close

judicial scrutiny." *Id.* at 372 (footnotes omitted). "Aliens as a class," the Court wrote, "are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." *Id.* (internal quotation marks and citation omitted).

The Court then concluded that the Arizona and Pennsylvania laws could not withstand strict scrutiny. *Id.* at 376. It rejected the states' fiscal motive: "[J]ustification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens. Aliens like citizens pay taxes and may be called into the armed forces . . . . [A]liens may live within a state for many years, work in the state and contribute to the economic growth of the state." *Id.* (internal quotation marks omitted). Thus, the Court concluded, "a state statute that denies welfare benefits to resident aliens and one that denies them to aliens who have not resided in the United States for a specified number of years violate the Equal Protection Clause." *Id.*

In addition, and significantly for present purposes, the Court rejected Arizona's argument that its durational residency requirement for aliens was authorized by a federal statute. *Id.* at 380-82. The statute, 42 U.S.C. § 1352(b) (1971), stated: "The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes, as a condition of eligibility for aid to the permanently and totally disabled under the plan-- . . . (2) Any citizenship requirement which

-13-

excludes any citizen of the United States." *Id.* at 380 (internal quotation marks omitted). Arizona argued that the statutory language implicitly authorized citizenship requirements that excluded non-citizens.

The Court observed that "[o]n its face, the statute does not affirmatively authorize, much less command, the States to adopt durational residency requirements or other eligibility restrictions applicable to aliens." *Id*. at 381. It then traced the language in question to the Social Security Act of 1935, when the language apparently was included to prevent treating naturalized citizens differently from native-born citizens. *Id.* at 381. The Court noted that the statute may have reflected Congressional understanding of the law as it stood in 1935, before *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948), had established the equal-protection rights of aliens. *Graham*, 403 U.S. at 382. Now, however, significant constitutional concerns would be raised by discrimination against aliens. The Court wrote:

> [W]ere [the federal statute] to be read so as to authorize discriminatory treatment of aliens at the option of the States, *Takahashi* demonstrates that serious constitutional questions are presented. Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.

*Id.* Moreover, the Court said that "[u]nder Art. I, § 8, cl. 4, of the Constitution, Congress' power is to 'establish an *uniform* Rule of Naturalization,'" *id.*

-14-

(emphasis added), and that a "congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity." *Id.* These constitutional concerns, the Court declared, argued against interpreting the statutory language to authorize state discrimination against aliens. "Since statutes should be construed whenever possible so as to uphold their constitutionality, we conclude that [the statute] does not authorize the Arizona 15-year national residency requirement." *Id.* at 382-83 (internal quotation marks and citation omitted).

A footnote to the quoted passage noted that the Court had "no occasion to decide whether Congress, in the exercise of the immigration and naturalization power, could itself enact a statute imposing on aliens a uniform nationwide residency requirement as a condition of federally funded welfare benefits." *Id.* at 382 n.14. As we will discuss below, that issue was resolved in *Mathews v. Diaz*, 426 U.S. 67 (1976).

In the years immediately following *Graham*, the Supreme Court reemphasized the central holding of the case: that state laws creating citizen-alien classifications must meet strict scrutiny. *See, e.g.*, *Bernal*, 467 U.S. at 219-20 (citizenship requirement for state notaries public is subject to strict scrutiny); *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 601-02 (1976) (same for state

civil engineering licenses); *In re Griffiths*, 413 U.S. 717, 721 (1973) (same for admission to state bar); *Sugarman v. Dougall*, 413 U.S. 634, 642 (1973) (same for state civil service jobs).  In particular, in *Nyquist v. Mauclet*, 432 U.S. 1 (1977), the Court held that a state could not circumvent *Graham* by contending that it was merely distinguishing among aliens, as opposed to discriminating against aliens vis-a-vis citizens.  Reviewing a statute restricting certain aliens' access to state-funded tuition assistance, the Court rejected the state's argument that strict scrutiny should not apply because the classification "distinguishe[d] only within the heterogeneous class of aliens and d[id] not distinguish between citizens and aliens vel non."  *Id.* at 8 (internal quotation marks omitted).  The Court wrote:

> Graham v. Richardson . . . undermines [the state's] position.  In that case, the Court considered an Arizona statute that imposed a durational residency requirement for welfare benefits on aliens but not on citizens.  Like the New York statute challenged here, the Arizona statute served to discriminate only within the class of aliens: Aliens who met the durational residency requirement were entitled to welfare benefits.  The Court nonetheless subjected the statute to strict scrutiny and held it unconstitutional.  The important points are that [the tuition assistance restriction] is directed at aliens and that only aliens are harmed by it.  The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class.

*Id.* at 8-9.

### 2. *Mathews v. Diaz*

In *Mathews v. Diaz*, 426 U.S. 67 (1976), the Court answered the question left open in *Graham*, holding that the federal government could impose a uniform

-16-

residency requirement as a condition of receiving federal benefits. *Mathews* considered a federal law granting Medicare benefits to certain resident citizens 65 years of age and older, but denying eligibility to comparable aliens unless they had been admitted for permanent residence and had resided in the United States for at least five years. *Id.* at 70.

The Court explained why Congress's broad constitutional powers over naturalization and immigration give it authority to treat aliens differently from citizens:

> The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification. For a host of constitutional and statutory provisions rest on the premise that *a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other*; and the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country.
>
> In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. The exclusion of aliens and the reservation of the power to deport have no permissible counterpart in the Federal Government's power to regulate the conduct of its own citizenry. *The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is "invidious."*
>
> In particular, the fact that Congress has provided some welfare benefits for citizens does not require it to provide like benefits for *all aliens. . . .*
>
> . . . .

For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since *decisions in these matters* may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions *are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary*. . . .

. . . In short, *it is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence*. Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind.

*Id.* at 78-83 (footnotes omitted) (emphasis added).

*Mathews* also distinguished *Graham*, recognizing that its "equal protection analysis . . . involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." *Id.* at 84-85. It explained that

[i]nsofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.

*Id.* at 85.

### 3. *Lower Courts*

Neither *Graham* nor *Mathews* determines the result in this case. Unlike *Graham*, here we have specific Congressional authorization for the state's action, the PRWORA. Unlike *Mathews*, here we have a state-administered program, and the potential for states to adopt coverage restrictions with respect to aliens that are not mandated by federal law.

The fact of state administration in itself is not a distinction from *Mathews* that has impressed the circuits that have addressed the matter. Following *Mathews*, several circuits have applied rational-basis review to uphold federal statutes restricting state-administered welfare benefits to legal aliens. *See, e.g.*, *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001) (upholding under rational-basis review PRWORA restrictions on alien eligibility for state-administered pre-natal Medicaid benefits); *City of Chicago v. Shalala*, 189 F.3d 598, 603-05 (7th Cir. 1999) (same for supplemental security income (SSI) and food stamps); *Aleman v. Glickman*, 217 F.3d 1191, 1197 (9th Cir. 2000) (same for food stamps); *Rodriguez v. United States*, 169 F.3d 1342, 1346-50 (11th Cir. 1999) (same for SSI and food stamps).

The potential for states to adopt coverage restrictions for aliens that are not federally mandated is, however, more problematic. The difficulty is illustrated by opinions addressing non-mandated state restrictions—one each from the high courts of New York and Massachusetts. We discuss each in turn.

In *Aliessa v. Novello*, 754 N.E.2d 1085 (N.Y. 2001), the New York Court of

Appeals reviewed state alien classifications that were authorized by the PRWORA. Relying on *Graham*, it concluded that the classification scheme must be subjected to strict scrutiny. New York's Medicaid system had two components—one was funded jointly by the state and federal governments, and one was solely state-funded. *Id.* at 1089. *Aliessa* reviewed only the state-funded portion of the program. *Id.* at 1089, n.3.

As it does with regard to jointly funded Medicaid programs, the PRWORA gives states flexibility to grant or deny aliens state-only Medicaid, so long as they adhere to certain requirements. *Id.* at 1091. In response to the PRWORA, the New York legislature enacted a law that terminated state-only Medicaid coverage for many aliens. *Id.* at 1091-92**.** Aliens who lost coverage brought suit, arguing that the new state law violated the state constitution and the Equal Protection Clause of the United States Constitution. *Id.* at 1092.

The parties' equal protection arguments in *Aliessa* mirrored those of the parties in this case: the plaintiffs argued that the state law discriminated based on alienage and that strict scrutiny should apply, and the state argued that it was acting with Congress's permission and that rational-basis review was appropriate. The court agreed with the plaintiffs, concluding that strict scrutiny applied and that the state law could not withstand it.

The court relied on the language in *Graham* that "a Federal statute authorizing 'discriminatory treatment of aliens *at the option of the States*' would

present 'serious constitutional questions,'" and that a "'congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene [the] explicit constitutional requirement of uniformity.'" *Id.* at 1097 (quoting *Graham*, 403 U.S. at 382) (emphasis in *Aliessa*). The court reasoned:

> [The federal statute] does not impose a *uniform* immigration rule for States to follow. Indeed, it expressly authorizes States to enact laws extending "any State or local public benefit" even to those aliens not lawfully present within the United States. The converse is also true and exacerbates the lack of uniformity: [the federal statute] provides that, subject to certain exceptions, States are authorized to withhold State Medicaid from even those qualified aliens who are eligible for Federal Medicaid under PRWORA. Thus, in administering their own programs, the States are free to discriminate in either direction—producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics. Considering that Congress has conferred upon the States such broad discretionary power to grant or deny aliens State Medicaid, we are unable to conclude that [the federal law] reflects a uniform national policy. If the rule were uniform, each State would carry out the same policy under the mandate of Congress—the only body with authority to set immigration policy.
>
> . . . New York—along with every other State—with Congressional permission is choosing its own policy with respect to health benefits for resident, indigent legal aliens. Thus, we address this case outside the context of a Congressional command for nationwide uniformity in the scope of Medicaid coverage for indigent aliens as a matter of federal immigration policy.

*Id.* at 1098 (internal citations omitted). The New York court concluded that strict scrutiny was the appropriate standard by which to assess the New York statute,

-21-

and held that the statute failed the test.  It wrote:

> We conclude that [the state law] is subject to . . . strict scrutiny, notwithstanding [the federal statute's ] authorization. . . . [The federal law] is directly in the teeth of *Graham* insofar as it allows the States to "adopt divergent laws on the subject of citizenship requirements for *federally* supported welfare programs." Moreover, [the federal statute] goes significantly beyond what the *Graham* Court declared constitutionally questionable.  In the name of national immigration policy, it impermissibly authorizes each State to decide whether to disqualify many otherwise eligible aliens from State Medicaid.  [The New York statute] is a product of this authorization.  In light of *Graham* and its progeny, [the federal statute] can give [the New York statute] no special insulation from strict scrutiny review.  Thus, [the New York statute] must be evaluated as any other State statute that classifies based on alienage.

*Id*. at 1098 (footnotes and internal citations omitted); *see Kurti v. Maricopa Cty.*, 33 P.3d 499, 505 (Ariz. Ct. App. 2001) (applying strict scrutiny to optional coverage of aliens for public health benefits).

The Massachusetts Supreme Judicial Court addressed similar issues in *Doe v. Comm'r of Transitional Assistance*, 773 N.E.2d 404 (Mass. 2002), but reached a different result.  It concluded that state-made intra-alien classifications are subject only to rational-basis review.  *Doe* involved a state-only supplemental-benefits program that was enacted to provide coverage to certain aliens who, based on the PRWORA, were going to lose the joint state-federal benefits they had previously received.  *Id.* at 407.  But the benefits provided by the supplemental program were restricted to aliens who had resided in Massachusetts for at least six months.  *Id.* at 407-08.

The plaintiffs in *Doe* argued that the six-month residency requirement violated the Equal Protection Clause because it imposed the requirement on some legal aliens, but not on other legal aliens and citizens. Here again, the dispute hinged on whether strict scrutiny or rational-basis review applied.

The court first emphasized that the benefits provided by the program went only to aliens (not citizens), meaning that the six-month residency requirement did not discriminate between citizens and aliens, but rather only amongst aliens. Then, after reviewing *Graham*, *Mathews*, and other relevant law, the court turned to the standard of review:

> We conclude that the appropriate standard of review in these circumstances depends on the nature of the classification that creates the distinction between subgroups of aliens. If that classification were a suspect one such as race, gender, or national origin, we would apply a strict scrutiny analysis. Where, as here, that classification is Massachusetts residency, the proper standard of review is rational basis. We reach this conclusion because we find that the operative classification for equal protection purposes in the setting of this case is not alienage, but residency.

*Id.* at 414 (internal citation omitted). (We note, however, that the court may have applied rational-basis review only because it viewed the distinction between aliens and citizens under the Massachusetts statute as not invidious to aliens. The court wrote:

> In concluding that a rational basis standard of review applies, we have also considered the context in which the supplemental program was enacted; its purpose and the clearly noninvidious intent behind its promulgation; the effect of its implementation on mitigating the harm to qualified alien families that might otherwise be without

substantial assistance for five years under the requirements of the welfare reform act; and the potential harm to those same families if the Legislature could only choose to create an all-or-nothing program as a remedy to their disqualification from federally funded programs.

*Id*.)

### 4. *Analysis*

The Supreme Court precedents establish two propositions. First, states on their own cannot treat aliens differently from citizens without a compelling justification. *See Graham*, 403 U.S. at 371-72, 376. Second, the federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis. *See Mathews*, 426 U.S. at 78-83. This case fits somewhere in between. Plaintiffs claim that its location is clear, because *Graham* said that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." 403 U.S. at 382. But we think the issue is more nuanced than the quoted proposition indicates.

We do not read *Graham* as being as categorical as Plaintiffs claim it is regarding the effect of Congressional authorization of state discrimination against aliens. If the Court had definitively decided that the distinctions made in Arizona law would be unconstitutional regardless of Congressional authorization, there would have been no cause for the Court to examine the legislative history of the federal statute that Arizona relied upon. *See Graham*, 403 U.S. at 382. Nor would the Court have needed to rely on a rule of construction—construing the

statute to avoid constitutional concerns—to resolve the case before it. *See id.* As we read *Graham*, the Court was, in essence, insisting on a clear expression of Congressional intent to permit states to discriminate against aliens before it would tackle the constitutional issue. *See id.*

We recognize that *Graham* said that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Id.* But that proposition is almost tautological. The question is not whether Congress can authorize such a constitutional violation. The question is what constitutes such a violation when Congress has (clearly) expressed its will regarding a matter relating to aliens. After all, Congress has extensive powers with respect to aliens derived from specific constitutional provisions as well as from the inherent powers of a sovereign nation. *See, e.g.*, *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) (stating that Congress's immigration power is "an incident of sovereignty"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

When Congress exercises these powers to legislate with regard to aliens, the proper standard of judicial review is rational-basis review. That is the lesson of *Mathews*. Although *Mathews* involved Medicare, a program administered and funded by the federal government, while the PRWORA involves a program

administered and partially funded by the states, that difference, as noted above, is immaterial in assessing the constitutionality of the federal legislation itself. *See Lewis*, 252 F.3d at 582; *City of Chicago*, 189 F.3d at 603-05; *Aleman*, 217 F.3d at 1197; *Rodriguez*, 169 F.3d at 1346-50.

There is, however, one significant difference between the federal law at issue here and the one at issue in *Mathews*. The present law gives the states a measure of discretion. Some benefits for aliens are required, some are prohibited. In between, the states are permitted to be more restrictive (or, depending on one's point of view, more generous). Relying on *Graham*, one could say, as Plaintiffs do, that when a state elects not to provide aliens with the maximum benefits permitted by federal law, it is discriminating against aliens and the federal government's imprimatur for such discrimination cannot reduce the level of scrutiny to which the state's choice is subjected under the Equal Protection Clause. This is the view adopted by the New York Court of Appeals in *Aliessa*.

We do not share that view. The reason for applying rational-basis review to federal law regarding aliens is that such laws reflect national policy that Congress has the constitutional power to enact. Once Congress has expressed that policy, the courts must be deferential. *See Mathews*, 426 U.S. at 78-83. What Plaintiffs fail to consider is that a state's exercise of discretion can also effectuate national policy. Recall that the PRWORA does not give the states unfettered discretion. Some coverage must be provided to aliens; some coverage is

forbidden.  State discretion is limited to the remaining optional range of coverage. In exercising that discretion each state is to make its own assessment of whether it can bear the burden of providing any optional coverage.  When a state determines that the burden is too high and decides against optional coverage, it is addressing the Congressional concern (not just a parochial state concern) that "individual aliens not burden the public benefits system."  8 U.S.C. § 1601(4). This may be bad policy, but it is Congressional policy; and we review it only to determine whether it is rational.

One way of regarding the impact of Congressional policy is to view the PRWORA in a way suggested by the analysis of the Massachusetts Supreme Judicial Court in *Doe*.  What Congress has done in the PRWORA is, in essence, create two welfare programs, one for citizens and one for aliens.  Within the aliens-only program, states have the option of including more or fewer aliens.  The decision to have separate programs for aliens and citizens is a Congressional choice, subject only to rational-basis review.  *See Mathews*.  A state's exercise of the option to include fewer aliens in its aliens-only program, then, should not be treated as discrimination against aliens as compared to citizens.  That aspect of the discrimination is Congress's doing—by creating one program for citizens and a separate one for aliens.  Rather, what the state is doing is discriminating within the aliens-only program against one class of aliens as compared to other classes of aliens.  *Cf. Mathews*, 426 U.S. at 80 ("The real question presented by this case is

not whether discrimination between citizens and aliens is permissible; rather, it is whether the statutory discrimination *within* the class of aliens allowing benefits to some aliens but not to others is permissible."). This discrimination among subclassifications of aliens is not based on a suspect classification (such as alienage). The discrimination, rather, is based on nonsuspect classifications such as work history or military service. We follow the Massachusetts Supreme Judicial Court's *Doe* decision in applying rational-basis review to such distinctions. *See* 773 N.E.2d at 414.

Furthermore, we reject the argument that the PRWORA's authorization to the states to provide or deny Medicaid benefits to certain aliens runs afoul of the uniformity requirement of the Constitution's Naturalization Clause. This argument rests largely on dictum in *Graham*. *Graham* considered whether Arizona's durational residency requirement for aliens was authorized by a federal statute. The Court ruled that the statute did not confer such authority. In reaching that conclusion the Court relied in part on the proposition that such statutory authorization would be of questionable constitutionality. The Court wrote:

> Under Art. I, § 8, cl. 4, of the Constitution, Congress' power is to "establish an uniform Rule of Naturalization." A congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs *would appear* to contravene this explicit constitutional requirement of uniformity. Since "statutes should be construed whenever possible so as to uphold their constitutionality," we conclude that [the federal statute] does not authorize the Arizona 15-year national residency requirement.

-28-

403 U.S. at 382-83 (emphasis added; footnote and internal citation omitted).

It is now our task to determine whether this appearance of unconstitutionality is real. To begin with, we note that Congressional power over aliens derives from more than just the Naturalization Clause. Other sources of Congressional authority include "its plenary authority with respect to foreign relations and international commerce, and . . . the inherent power of a sovereign to close its borders." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (Equal Protection Clause is violated by state law authorizing local school districts to deny enrollment to children not legally admitted into the United States).

Indeed, it is not at all clear how the authority "[t]o establish an uniform Rule of Naturalization" is being exercised when Congress restricts welfare benefits to aliens on grounds that have no direct relationship to the naturalization process. Whether the alien is seeking naturalization is not a consideration under the PRWORA. We find it significant that *Mathews* made no explicit mention of the Naturalization Clause in upholding Congressional authority to establish a residency requirement for aliens to obtain Medicare benefits. Of course, if Congressional authority for the PRWORA's provisions regarding aliens does not rest on the Naturalization Clause, the limits on the exercise of power under that clause do not necessarily apply; the uniformity requirement is imposed only on a "Rule of Naturalization."

Moreover, the purpose of the uniformity requirement in the Naturalization

Clause is not undermined by the PRWORA's grant of discretion to the states with respect to alien qualifications for Medicaid benefits. The uniformity requirement was a response to the widely divergent practices among the states under the Articles of Confederation with respect to the requirements to become a naturalized citizen. One state would have a lenient rule, another a very strict rule; yet the Articles required the strict state to treat as a full citizen anyone admitted to citizenship by the lenient state. *See* Michael Hertz, *Limits to the Naturalization Power*, 64 Geo. L.J. 1007, 1009-17 (1976); Judith Schenck Koffler, *The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. Rev. 22, 85-87 (1983). Here, the choice by one state to grant or deny Medicaid benefits to an alien does not require another state to follow suit. We also note that there is reason to believe that at least some Founders did not believe that the Immigration Clause in itself precluded individual states from adopting more lenient standards for naturalization. *See U.S. Term Limits Inc., v. Thornton*, 514 U.S. 779, 873 n.13 (1995) (Thomas, J., dissenting).

One final point needs to be addressed. Plaintiffs argue that the language of 8 U.S.C. § 1601(7) illustrates that Congress intended strict scrutiny to apply to state laws that alter legal aliens' eligibility for jointly funded benefit programs. That section states:

> With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in

determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

*Id.* We think Plaintiffs read too much into this provision. For Congress to say that its statute would survive strict scrutiny is a far cry from Congress's stating that the statute *should be* subject to such scrutiny. We find no reason to believe that Congress wanted to impose on its statute a standard of review more stringent than what the Constitution requires.

### 5. *Appropriateness of Injunctive Relief*

Our analysis of Plaintiffs' equal-protection claim enables us to short-circuit the factor-weighing process for determining whether to grant injunctive relief. The merits issue on this appeal is a pure matter of law. No material facts are disputed. When we determine that a claim lacks merit, we can hardly find an abuse of discretion in denying injunctive relief. To grant relief in that circumstance would be to ignore the demands of the law and express our personal policy views regarding the importance of the interests of the parties and the public.

### B. Alleged Procedural Violations

Plaintiffs contend that the procedures used by the Colorado Department in implementing SB 03-176 have three defects: (1) prior to terminating affected Medicaid recipients the Department failed to perform a "full eligibility

redetermination" to assess whether the recipients qualified for Medicaid under any other eligibility categories; (2) the state improperly denied certain of the affected recipients an opportunity for a hearing (sometimes referred to as an appeal) to contest the county termination decision before it takes effect; and (3) the state failed to provide timely and adequate notice to the affected recipients prior to terminating coverage. Plaintiffs claim that each of these deficiencies violates the Medicaid Act, and that the second and third also violate the Due Process Clause of the Fourteenth Amendment. They seek injunctive relief forbidding implementation of SB 03-176 until the procedural deficiencies are corrected.

The district court concluded that Plaintiffs had not shown a substantial likelihood of success with respect to the merits of their procedural claims. After reviewing the Department's procedures, the court observed that "[t]he evidence adduced at the hearing demonstrated the organized, comprehensive, and proactive manner the Department employed to anticipate and implement SB 03-176 consistent with extant federal and state law and regulations." *Soskin v. Reinertson*, 257 F. Supp. 2d 1320, 1327 (D. Colo. 2003). It stated that "the Department notified the counties [of SB 03-176], instructed them to provide notice to affected recipients, and provided information about how to assess clients, how to determine whether an alien could continue as Medicaid eligible, how to provide notice to each client, and how to calculate the forty working quarters attributable to each client which could affect an alien's continuing coverage." *Id.* at 1328. According

to the court, "[S]ystemically the Department did all that it was required to do under due process to provide timely and sufficient notice to aliens potentially affected by SB 03-176." *Id.*

We address Plaintiffs' three contentions in turn.

### 1. *Redetermination Process*

#### a. System Established by Department

The purpose of the redetermination process is to ascertain whether individuals who lose their status under one eligibility category may qualify under a different eligibility category. After SB 03-176 passed the legislature but before it was signed by the Governor, the Department sent a letter to the counties outlining redetermination procedures. The letter began by describing which legal aliens would be adversely affected by the new law, and which would still be eligible for coverage. It noted that legal permanent residents with 40 quarters of work history would remain eligible, as would honorably discharged veterans and their immediate family members, active duty military personnel and their family members, and certain other specified groups (such as Canadian-born Indians with at least 50% American Indian blood).

The letter then set forth what it described as "the steps necessary to implement [SB 03-176] and stay in compliance with Medicaid eligibility rules." Aplt. App. at 125. The counties were instructed first to compile a list of all

Medicaid clients whose status would need to be redetermined as a result of SB 03–176. The Department assisted the counties by attaching to each letter a county-specific report identifying the Medicaid clients whom the Department's database recorded as having alien registration numbers.

Once the county had compiled the redetermination list, it was to pull the files of everyone on the list and check them for "immigration verification." (The parties have not explained what is entailed in an "immigration verification," nor have we found an explicit explanation in the record, although it appears to encompass obtaining data relating to all qualification categories for aliens, including work history and military service.) If the file included immigration verification from within the preceding three months indicating that the individual met current eligibility requirements, coverage for that person would be maintained. If, however, the file indicated that the individual did not meet the new Medicaid eligibility requirements, the county was to perform an ex parte redetermination. The letter cryptically stated that "[t]hese individuals can be discontinued without requesting additional verification from the client." Aplt. App. at 126. The letter does not describe the procedures to follow in performing such an ex parte review.

Because legal permanent residents with 40 creditable work quarters would be eligible for continued Medicaid coverage, the Department's letter instructed

the counties to use the state's work-history database to "[i]dentify legal permanent residents with 40 quarters of work history." *Id*. The letter did not specifically instruct the counties to inquire into the work history of an individual's spouse during marriage or of a parent while the individual was under 18. *See* 8 U.S.C. § 1645 (including such work history in calculation of individual's eligibility). But an attachment to the letter defined "40 Qualifying Quarters" as including those of parents and spouses:

> A qualifying quarter means a quarter of coverage as defined under title II of the Social Security Act, which is worked by the alien, and/or
>
> •       All the qualifying quarters worked by the spouse of such alien during their marriage and the alien remains married to such spouse or such spouse is deceased, and
>
> •       All of the qualifying quarters worked by a parent of such alien while the alien was under age 18 . . . .

Aplt. App. at 37-38. It appears that those who had 40 verifiable quarters of work history would be removed from the list of aliens to be considered for termination, and that those who did not have the necessary quarters would remain on the list (although neither the letter nor record are altogether clear on this point).

The county officials were then to complete a redetermination of Medicaid eligibility for all who remained on their lists after these initial reviews. The

-35-

letter directed county officials to send redetermination packets to all aliens who had an unknown immigration status. The Department provided a redetermination form to include in the packet. The form told potentially affected individuals of the impending Medicaid eligibility changes for legal immigrants. It stated:

> Due to a new state law, Medicaid eligibility must be redetermined for legal immigrants. Our records show that the following people in your household are legal immigrants. They must have their Medicaid redetermined. Please send us a copy of each person's current INS card. Also, answer all 5 questions below for each person. If you do not provide the requested information within 10 days from the date listed above, the following people will lose their Medicaid."

Aplt. App. at 132. The five questions for each listed member of the household were: (1) "[What is your] [s]ocial security number, if available[?]" (2) "Is this person a US citizen?" (3) "Country of origin?" (4) "Is this person on active duty in the U.S. Armed Forces or a spouse, surviving spouse or child of one?" and (5) "Is this person a veteran, survivor of a veteran, or a dependent of a veteran?" *Id.*

If the redetermination packet was not returned within 10 business days, the Department directed the counties to send a "Notice of Medicaid Closure" form, along with a second redetermination form. The sample notice form, which apparently was to be used only in cases in which affected recipients did not timely return their redetermination forms, stated:

**Notice of Medicaid Closure**

[Name, Address, and Date]

This notice is to tell you that Medicaid has been **Closed** effective **March 30, 2003** for the following family member(s) of your household:

[NAME]

The household member(s) listed above lost their Medicaid because a new state law changed the citizenship requirements for the program. The person(s) listed above did not provide the required verification of their immigration status to complete the redetermination of eligibility.  **8.100.7 and 8.100.53 A (10CCR-2505-10)**

If you have any questions about this letter, please contact Medicaid Customer Service at (303) 866-3513 or 1-800-221-3943.

This statement certifies that health coverage has been provided to the following client(s) through Colorado Medicaid in accordance with the Health Insurance Portability and Accountability Act.

[Client Name]      [Coverage Dates]

Aplt. App. at 136.  If still no response was received after the second redetermination packet and Medicaid closure form were sent, the counties were to terminate the individual's Medicaid coverage.  The letter did not direct what form of notice to use for such terminations.

Five days after the Department mailed its letter to the counties, there was a

conference call with state and county Medicaid officials to discuss the letter and the implementation process. Forty counties participated in the call. The record does not provide details of what was discussed.

### b. Adequacy of the Department's Process

Plaintiffs assert that the redetermination procedures described above fail to satisfy the requirements set forth in the Medicaid Act and its implementing regulations, because they do not provide for a full redetermination of eligibility of aliens excluded by SB 03-176. They contend that (1) the Department employee in charge of Medicaid conceded at the evidentiary hearing that she did not conduct "full redeterminations of eligibility" prior to terminating coverage; and (2) the Department failed to direct the counties to determine whether recipients affected by SB 03-176 are eligible for coverage under any other eligibility category. In particular, they assert that the Department failed to require counties to request work histories of spouses or parents to determine whether they had quarters of work that could be credited to the affected individual.

To support their claim of a full-redetermination requirement, Plaintiffs rely on a statute, a regulation, and a few judicial opinions. The statute is 42 U.S.C. § 1396a(a)(8), which states: "A State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be

furnished with reasonable promptness to all eligible individuals." The regulation is 42 C.F.R. § 435.930(b), which states: "The [state] agency must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." Plaintiffs then point out that several courts have held that this federal statute and regulation (or their earlier versions) together require an ex parte redetermination process before termination of a Medicaid recipient. *See Crippen v. Kheder*, 741 F.2d 102, 104-07 (6th Cir. 1984); *Mass. Ass'n of Older Ams. v. Sharp*, 700 F.2d 749, 751-54 (1st Cir. 1983); *Stenson v. Blum*, 476 F. Supp. 1331, 1339-42 (S.D.N.Y. 1979); *Olson v. Reagen*, No. 85-101-A, 1985 U.S. Dist. Lexis 20823, at *7-8 (C.D. Iowa April 11, 1985).

Assuming, without deciding, that we would follow those decisions, we observe that none of the decisions (or the laws they rely on) speak to the scope of the redetermination review that would be required here, such as what records should be obtained and how they should be analyzed. In *Sharp*, for example, eligibility would have been immediately apparent. *See* 700 F.2d at 751-54. The plaintiffs in *Sharp* had been eligible for Medicaid as recipients of Aid to Families with Dependent Children (AFDC), but they lost their AFDC eligibility as a result of a change in the law that required including stepparent income in determining AFDC eligibility. *Id.* at 751. Medicaid rules were unchanged, however, so stepparent income was irrelevant to their Medicaid eligibility. *Id.* at 753-54. The statute, regulation, and case law cited by Plaintiffs do not support the proposition

that the Department's extensive redetermination process was inadequate.

In addition, Plaintiffs make a passing reference to a letter (not included in the record) to the state Medicaid directors from the Director of the Center for Medicare and Medicaid Services, the United States Department of Health and Human Services division that administers Medicaid and promulgates implementing regulations. That letter discusses the redetermination process. But Plaintiffs offer no argument why this letter has the force of law.

In any event, Plaintiffs have not produced substantial evidence that the Department's redetermination process is inadequate. First, we disagree with Plaintiffs' assertion that Defendant has conceded that the Department failed to require "full redetermination[s] of eligibility." Plaintiffs rely on an isolated remark at the district court evidentiary hearing by Diana Maiden, the Department employee in charge of Medicaid services, the same witness who discussed in detail how the Department conducted the elaborate redetermination process discussed above. True, Ms. Maiden said, "[W]e were not asking for a full re-determination on all aspects of eligibility." Aplt. App. at 436. It appears, however, that she meant only that the counties were not required to review eligibility requirements that apply to all Medicaid recipients, but were required only to look at factors applicable to aliens. As noted in Defendant's brief, "[C]itizenship is a prerequisite to all other eligibility categories with the

exception of Supplemental Security Income ("SSI") and IV-E Foster Care recipients, [so] a full redetermination is unnecessary." Aple. Br. at 20-21. Ms. Maiden certainly was not saying that counties had no obligation to assess alternative bases of eligibility for those whose existing eligibility was to be eliminated by SB 03-176.

Also, although Plaintiffs have offered (minimal) evidence that one of the named Plaintiffs may in fact remain eligible for Medicaid benefits even if SB 03-176 is lawful, they have not provided evidence that the information establishing eligibility could have been acquired through ex parte procedures, so we have no reason to doubt the adequacy of the state's ex parte review. And even if an error was made, Plaintiffs have not shown that the error was systematic, rather that being the isolated error of a single worker. Moreover, it appears that lapses in the ex parte review would ordinarily be correctable through information requested from recipients in the redetermination process conducted before termination of benefits. (We note in particular that, as we read the record, Plaintiffs erred in saying that county officials were not instructed to obtain relevant work histories of spouses and parents.)

### c. Propriety of Relief Requested

Plaintiffs have not shown a substantial likelihood of success on the merits of their challenge to the Department's redetermination process. They also have

failed to show a threat of irreparable injury. As we explain below, any person subject to termination of benefits under SB 03-176 is entitled to a hearing before termination. Errors in the redetermination process can be exposed at the hearing.

Given the absence of irreparable injury and the failure to show a substantial likelihood of success on the merits, the district court did not abuse its discretion in denying injunctive relief on this ground, regardless of how one evaluates the remaining two factors relating to the propriety of such relief.

### 2. *Right to Hearing*

We next turn to Plaintiffs' argument that the Department improperly deprived certain recipients of their right to appeal the County's decision through a pre-termination hearing. Plaintiffs complain that those individuals who failed to return their redetermination forms had their eligibility terminated without appeal rights. This is improper, Plaintiffs argue, because the Medicaid Act and Due Process Clause provide recipients a right to a hearing whenever the state takes action to deny services or eligibility. Because we determine that Plaintiffs' claim succeeds under the Medicaid Act, we need not address constitutional due process.

We start with a brief review of the relevant facts. As part of the redetermination process, the Department instructed counties to send packets to affected individuals, seeking information that would allow the counties to ascertain continued eligibility. If the first packet was not returned within 10 days,

a second packet, along with a Notice of Medicaid Closure form, was sent. If the county received no response to the second packet, it was to terminate coverage. As Plaintiffs point out, Department employee Ms. Maiden testified that those individuals who failed to respond to two redetermination packets were terminated without appeal rights (though she did indicate that those recipients could reapply for Medicaid and have their eligibility reinstated if they came forward with adequate documentation).

Turning now to the governing law, the Medicaid Act, 42 U.S.C. § 1396a(a)(3), states that a state agency must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the [state] plan is denied or is not acted upon with reasonable promptness." Additionally, one of the implementing regulations, 42 C.F.R. § 431.220, directly addresses when hearings are required; it states:

**When a hearing is required.**

(a) The State agency must grant an opportunity for a hearing to the following:

(1) Any applicant *who requests it* because his claim for services is denied or is not acted upon with reasonable promptness.

(2) Any recipient *who requests it* because he or she believes the agency has taken an action erroneously.

. . . .

(b) The agency need not grant a hearing if the sole issue is a Federal

-43-

> or State law requiring an automatic change adversely affecting some or all recipients.

42 C.F.R. § 431.220 (emphasis added). If a hearing is requested, the affected individual maintains eligibility pending the outcome of the hearing. 42 C.F.R. § 431.231; Volume 8, Colorado Medicaid Manual § 8.057.5. Thus, the hearing contemplated by the regulations is in effect a pre-termination hearing.

Defendant relies on the exception created by § 431.220(b) to argue that the Department was not required to provide hearings to individuals whose eligibility was eliminated by SB 03-176. Because Plaintiffs contest only Defendant's failure to provide a hearing to those individuals who were terminated based on their failure to return the redetermination forms, we limit our analysis to that issue.

We do not agree that § 431.220(b) applies here. In our view a law imposing an automatic change in benefits is not "the sole issue." Affected individuals who did not timely return their redetermination forms could contest several factual matters. For example, they could assert that they did return the form but that the county lost it or failed to process it; or they could argue that they never received either of the two redetermination forms the county allegedly mailed. They might also be able to argue that they are eligible based on an alternative eligibility category—40 quarters of work, veteran status, etc. The potential for these various factual disputes makes inapplicable the hearing exception provided by § 431.220(b).

-44-

Such potential factual disputes renders Defendant's reliance on *Benton v. Rhodes*, 586 F.2d 1 (6th Cir. 1978), misplaced. *Benton* involved a new state policy that categorically terminated certain types of supplies and services—over-the-counter drugs, medical supplies, non-emergency ambulatory coverage, dental services, speech therapy, etc.—that were provided to *all* Medicaid recipients. *Id.* at 2. The court held that no hearings were required because the *sole issue* was legal, not dependent upon the factual circumstances of individual recipients. *See id.* at 3-4. There was no factual scenario in which people would otherwise qualify for the supplies and services that the state law discontinued. *See id.*

Because § 431.220(b) is inapplicable, the other provisions of § 431.220 remain effective. Specifically, "[t]he State agency must grant an opportunity for a hearing to . . . (2) Any recipient who requests it because he or she believes the agency has taken an action erroneously." 42 C.F.R. § 431.220. No such hearing rights were recognized by the Department for those individuals who failed to return their redetermination forms. Accordingly, we conclude that Plaintiffs have shown a substantial likelihood of success on the merits of this issue. The other factors clearly weigh in favor of Plaintiffs. We therefore reverse in part the district court's denial of a preliminary injunction. Defendant should be preliminarily enjoined from denying a request for an appeal by one whose benefits are to be terminated for failure to return a redetermination form.

### 3. *Sufficiency of Notice*

Plaintiffs' final argument is that the notice forms used by the Department to terminate eligibility are facially invalid because "they fail to provide an adequate statement of appeal rights or an explanation of the basis for the termination sufficient to enable recipients to identify themselves as having been terminated erroneously." Aplt. Br. at 48. They contend that such information is required by the Medicaid Act and regulations, as well as by the Due Process Clause.

The Medicaid Act's implementing regulations set forth requirements for notice related to the right to appeal and the reasons for termination. Addressing appeal rights, 42 C.F.R. § 431.206 states that "[a]t the time of any action affecting [a recipient's] claim," *id.* § 431.206(c),

> (b) The agency must . . . inform every applicant or recipient in writing--
>
>> (1) Of his right to a hearing;
>>
>> (2) Of the method by which he may obtain a hearing; and
>>
>> (3) That he may represent himself or use legal counsel, a relative, a friend, or other spokesman.

42 C.F.R. § 431.206. Furthermore, 42 C.F.R. § 431.210 states that the notice must contain—

> (a) A statement of what action the State . . . intends to take;
>
> (b) The reasons for the intended action;

-46-

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of—

   (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or

   (2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

42 C.F.R. § 431.210.

The constitutional right to due process may also impose notice requirements. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970) (when public welfare benefits are terminated, due process "principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination").

Plaintiffs' brief alleges that inadequate notice was provided by each of seven different forms of notice used to implement SB 03-176—the Notice of Medicaid Closure Form quoted above and six others. We share Plaintiffs' concern about the adequacy of notice provided by the forms. The notice of appeal rights on certain forms appears to be inaccurate. Also, there is room for

improvement in some of the language explaining why benefits are being terminated. Nevertheless, the factual record is so deficient that the district court did not abuse its discretion in failing to find a likelihood of success on the merits. The briefs do not explain, and the record before us does not reveal, critical information regarding the notices, such as: (1) Which notice went to what people? (2) Under what circumstances was the notice sent? (3) What other information, if any, had previously been provided to the recipients? (4) Were notices other than the seven challenged by Plaintiffs sent to persons to be terminated? This information is essential to an assessment of whether language in a notice is likely to be misleading to those who actually receive it.

This same lack of information also makes it impossible to determine who, if anyone, is likely to suffer injury in the absence of better notice. It would be inappropriate to issue an injunction with respect to all alien Medicaid recipients if only a fraction are receiving improper notice.

In the absence of an adequate showing of either a likelihood of success or irreparable injury, the district court did not abuse its discretion in denying injunctive relief. The sole exception relates to notice to those who were terminated for failure to return the redetermination forms. Defendant admits that those persons were not notified of the right to request a hearing. We therefore REVERSE the district court's denial of a preliminary injunction requiring that

such persons be advised of the right to request a pre-termination hearing. Moreover, we express the hope that Defendant will review all notices so that it can revise and resend (or instruct the counties to resend) notice to those of the 3,500 affected persons who may have received inadequate notice.

## III. CONCLUSION

We VACATE our injunction pending appeal and AFFIRM the district court's denial of Plaintiffs' motion for a preliminary injunction, except that we REVERSE in part and REMAND to the district court for entry of a preliminary injunction prohibiting Defendant from terminating benefits to any member of the class for failure to return redetermination forms unless the member has been given notice of the right to request a pre-termination hearing.

*Soskin v. Reinhartson*, 03-1162
**HENRY, J.,** dissenting:

# I. Introduction

Although America is very much a nation of immigrants, portions of its history are replete with instances of discriminatory policies and practices against aliens. "Whether it is founded on economic protectionism, xenophobia, or other motivations, aliens frequently have been denied benefits and privileges accorded to citizens." ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 9.5.1 at 738 (2d ed. 2002). Even the judiciary, charged under the Constitution with the protection of rights, does not have a pure historical record. *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214 (1944); *see also* William H. Rehnquist, The Supreme Court: How it Was, How it Is 313 (1987) ("But a governmental order classifying people solely on the basis of race without any inquiry into disloyalty in a particular case undoubtedly strains the bounds of the Constitution even in time of war."). Fortunately, the Supreme Court clearly reversed that trend in *Graham v. Richardson*, 403 U.S. 365, 372 (1971), holding that strict scrutiny is appropriate to safeguard the constitutional rights of aliens.[1]

---

[1] This history is certainly counter-intuitive for a nation populated not just at the outset, but through its history, by recurrent waves of immigration. For example "early twentieth-century restrictionists viewed Italians and Eastern Europeans (especially Jews) as outside their 'race.'" Hiroshi Motomura, *Whose Alien Nation?: Two Models of Constitutional Immigration Law*, 94 Mich. L. Rev. 1927, 1931 (1996). This is particularly morally ironic, noting that Jewish law is one of the major foundations for modern equal protection doctrine. *See* Richard Elliott Friedman, Commentary on the Torah 385 (2001) ("And if an alien will reside with you in your land, you shall not persecute him. *The alien who resides*

(continued...)

In the case at bar, the majority has advanced a deft methodology, but it disregards the Supreme Court's mandate that we apply strict scrutiny to a state's classification of persons on the basis of United States citizenship for the purposes of distribution of economic benefits. Colorado's program undisputedly discriminates between subclasses of legal aliens and classifies a group of legal aliens as ineligible for benefits. The majority holds that, under *Graham* and its progeny, if the federal government expresses a policy that gives the states the option to provide coverage for legal aliens, then we apply rational review to the state's actions. In refusing to apply strict scrutiny to Colorado's classification of legal immigrants as ineligible for Medicaid coverage, the majority compromises this court's equal protection jurisprudence, as Colorado S.B. 03-176 compromises the rights of legal, tax-paying, and military-serving aliens.

---

[1](...continued)
*with you shall be to you like a citizen of yours,* and you shall love him as yourself, because you were aliens in the land of Egypt. I am the YWWH, your God." (trans. of *Leviticus* 19:33-34)) (emphasis supplied). "Earlier and in like manner, many who sought to preserve American 'racial purity' in the mid-nineteenth century did not consider the Irish to belong to the same race as Anglo-Saxon Protestant immigrants." Motomura, *supra*, at 1931.

## II. The General Rule

In *Graham*, the Supreme Court reiterated that the Fourteenth Amendment mandates that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." 403 U.S. at 372 (footnotes omitted). The protections of the Fourteenth Amendment have long-applied to non-citizens; indeed, its "provisions are universal in their application[] to all persons within the territorial jurisdiction[] without regard to any difference or race, or color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

We have long recognized that "[a]liens as a class are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." *Graham,* 403 U.S. at 372 (internal quotation marks and citation omitted); *see United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). As the late Professor John Hart Ely, one of America's most distinguished constitutional scholars observed, the "Equal Protection Clause is properly read to extend unusually strenuous protection to aliens." John Hart Ely, Democracy and Distrust 194 n.51 (1980). In fact, Professor Ely also argued that the Privileges and Immunities Clause could, and perhaps should, be read to apply to aliens. *See id.* at 24-25.

The unbiased treatment of legal aliens–the "strangers at thy gates"–is more than simply a long-standing tradition from which U.S. citizens have benefitted: it

is a bedrock principle of the development of law-based nations and cultures throughout history. Recent policy initiatives underscore our nation's abidance to the tenet of nondiscrimination based on national origin. *See, e.g.*, Exec. Order No. 13,166 (delineating parameters for the provision of meaningful access to federal programs for persons of limited English proficiency to assure compliance with Title VI of the Civil Rights Act of 1964, as amended, and its implementing regulations).

The recognition of aliens as a discrete and insular minority partially stems from the preclusion of aliens from voting. Aliens are thus unable to protect themselves through the normal democratic process. *See Toll v. Moreno*, 458 U.S. 1, 21 (1982) (Blackmun, J., concurring) ("[T]he Court always has recognized that aliens may be denied use of the mechanisms of self-government, and *all* of the alienage cases have been decided against the backdrop of that principle.").

Justice Blackmun, concurring in *Toll v. Moreno*, gave a compelling explanation of the Court's consistent treatment of the discrete class of aliens:

> If anything, the fact that aliens constitutionally may be–and generally are–formally and completely barred from participating in the process of self-government <u>makes particularly profound the need for searching judicial review</u> of classifications grounded on alienage. I might add that the Court explicitly has endorsed this seemingly self-evident proposition: in *Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976), after noting that "[s]ome of [an alien's] disadvantages stem directly from the Constitution itself," the Court declared that "[t]he legitimacy of the delineation of the affected class [of aliens] buttresses the conclusion that it is a discrete and insular minority . . . and, of course, is consistent with the premise that the class is one

-4-

whose members suffer special disabilities." *Id.* at 102, n. 22.

*Toll*, 458 U.S. at 23-24 (Blackmun, J., concurring) (emphasis supplied).

Similarly, then-Associate Justice Rehnquist explained:

> It is clear, therefore, that the reason alienage classifications receive heightened judicial scrutiny is because aliens, qua aliens, are a "discrete and insular" minority. Presumptively, such a minority group, . . . is one identifiable by a status over which the members are powerless. And it is no doubt true that all aliens are, at some time, members of a discrete and insular minority in that they are identified by a status which they are powerless to change until eligible to become citizens of this country.

*Nyquist v. Mauclet*, 432 U.S. 1, 17-19 (1977) (Rehnquist, J., dissenting) (internal quotation marks and citations omitted).

Because of the relatively powerless status aliens maintain in our society, laws that create classifications based on alienage are presumptively invalid, and the classification will be found to be constitutional only if the state can demonstrate that the law is the least restrictive means to achieve a compelling state interest. *In re Griffiths*, 413 U.S. 717, 721-22 (1973) ("In order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose or the safeguarding of its interest.") (internal footnotes and quotation marks omitted).[2]

---

[2]    Although strict scrutiny review is the general rule when states create

(continued...)

As Justice Blackmun made clear, by labeling aliens as a discrete and insular minority, the Court reiterated its "considered conclusion that for most legislative purposes there simply are no meaningful differences between resident aliens and citizens, so that aliens and citizens are persons similarly circumstanced who must be treated alike." *Toll*, 458 U.S. at 20 (Blackmun, J., concurring) (internal quotation marks omitted). With this considered conclusion in mind, we turn to its application to Colorado's statute.

---

[2](...continued)
classifications based on alienage, the Supreme Court has created two discrete and specific exceptions. The Court recognizes a self-government exception that applies when a state creates a law excluding aliens from participation in its democratic political institutions. Only rational basis review is used under this exception. Thus, a "State, in the course of defining its political community, may, in appropriate circumstances, limit the participation of noncitizens in the States' political and governmental functions." *Toll*, 458 U.S. at 12 n.17 (citing *Cabell v. Chavez-Salido,* 454 U.S. 432 (1982); *Ambach v. Norwick,* 441 U.S. 68, 72-75 (1979); *Foley v. Connelie,* 435 U.S. 291, 295-96 (1978); *Sugarman v. Dougall,* 413 U.S. 634, 646-49 (1973)).

Second, the Supreme Court has recognized an exception to the application of strict scrutiny in one case concerning undocumented or illegal aliens. In *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court applied an intermediate level of scrutiny and declared unconstitutional a Texas law that provided free public education for children of citizens and lawfully admitted aliens, but required undocumented aliens to pay for schooling for their children. The Court held that strict scrutiny was inapplicable because illegal aliens cannot be treated as a suspect class. *Id.* at 223. However, the Court applied more than rational basis review, emphasizing the innocence of the children involved and the importance that such children receive an education. *Id.* at 223-24. Here, of course, we are dealing with legal aliens, who pay taxes and are eligible to serve in the military.

**A. The Twin Holdings of *Graham v. Richardson***

It is well-recognized that *Graham* established two distinct constitutional hurdles for state legislation discriminating against legal immigrants: (a) Part II of the opinion, which mandates that state legislation must satisfy strict scrutiny, 403 U.S. at 372 ("Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate.") (internal citations omitted); and (b) Part III of the opinion, which holds that state legislation must not encroach upon exclusive federal power, *id.* at 380 ("Since such laws encroach upon exclusive federal power, they are constitutionally impermissible."). *See also Toll*, 458 U.S. at 30 (O'Connor, J., concurring) (recognizing the encroachment of federal power as an "alternative ground" for striking the state statute). The twin holdings of the Court are also apparent from the Court's vote: the Court unanimously held that state legislation cannot encroach upon exclusive federal power. Justice Harlan did not join the Court's equal protection ruling (Part II of the opinion).

**1. Strict scrutiny**

In *Graham*, the Court considered a Pennsylvania law that made noncitizens ineligible to receive public assistance and an Arizona statute that imposed a durational residency requirement for welfare benefits on aliens but not on citizens. Like Colorado's S.B. 03-176, the Arizona statute served to discriminate only within the class of aliens: "Aliens who met the durational residency requirement

were entitled to welfare benefits." *Nyquist*, 432 U.S. at 8-9 (discussing *Graham*). The Court nonetheless subjected the statutes to strict scrutiny and both statutes were held unconstitutional. *Graham*, 403 U.S. at 372.

### 2. Encroachment of federal power

"As an alternative ground, the [*Graham*] Court also declared the law invalid as an encroachment on federal power." *Toll*, 458 U.S. at 30 (O'Connor, J., concurring). The plaintiffs do not challenge that the federal preemption holding of Part III of the *Graham* opinion is not at issue here. Colorado is not imposing "auxiliary burdens upon the entrance or residence of aliens," because it is acting pursuant to federal authorization in 8 U.S.C. § 1612(b). *Graham,* 403 U.S. at 379; *accord DeCanas v. Bica*, 424 U.S. 351, 358 n.6 (1976) (discussing preemption and noting that "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress"). As such, we should focus on the strict scrutiny holding in Part II of *Graham.*

### B. Strict Scrutiny Post-*Graham*

As the majority notes, since *Graham,* "the Court has experienced no noticeable discomfort in applying strict scrutiny to alienage classifications." *Toll*, 458 U.S. at 22 (Blackmun, J., concurring); *see* Maj. op. at 16; *see, e.g.,*

*Examining Bd. v. Flores de Otero*, 426 U.S. 572, 601-02 (1976) (applying strict scrutiny for limitations on state civil engineering licenses and noting that the Court had "establish[ed] that state classifications based on alienage are subject to strict judicial scrutiny") (internal quotation marks omitted)*; Sugarman v. Dougall*, 413 U.S. 634, 642 (1973) (holding that the exclusion of aliens from civil service jobs denied them equal protection and that a "flat ban on the employment of aliens in positions that have little, if any relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment"); *In re Griffiths*, 413 U.S. at 721 (applying strict scrutiny to a state law that excluded aliens from being licensed as attorneys); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 438 (1982) ("[C]itizenship is not a relevant ground for the distribution of economic benefits.").

In *Mathews v. Diaz*, 426 U.S. 67 (1976), the Supreme Court upheld as constitutional the amendments to the Social Security Act that conditioned an alien's eligibility for Medicare benefits on the alien's continuous residence in the United States for five years and admission for permanent residence. In doing so, the Supreme Court recognized that

> the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the

Judiciary.

426 U.S. at 81.  *Mathews* also distinguished *Graham*, recognizing that its "equal protection analysis . . . involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." *Id.* at 84-85.  The Court explained that

> [i]nsofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country.  Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned.  Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.

*Id.* at 85 (emphasis supplied).  The Court thus articulated the "distinction between alienage classifications imposed by the federal government and those created by state and local governments."  Chemerinsky, *supra*, § 9.5.4.  The federal government, rather than the states or the judiciary, regulates the condition of entry and residence of aliens.  *Mathews*, 426 U.S. at 85.  Thus, whereas the federal government might "routine[ly] and normally" create divisions between citizens and aliens as a "legitimate part of its business," a similar division a by a state "has no apparent justification." *Id.*  Because "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government," *id.* at 81, the Supreme Court

-10-

afforded the statute a deferential standard of review.  *Id.* at 82.  The Court thus upheld the federal program because it was not "wholly irrational" and served the "legitimate" purpose of securing the fiscal integrity of the Medicaid program at issue.  *Id.* at 83, 85.

Particularly relevant here, as the majority notes, is that in the following year, the Court applied *Graham*'s strict scrutiny analysis to invalidate a New York law that limited financial aid for higher education to citizens, those who had applied for citizenship, and those who declared an intent to apply when they became eligible.  *Nyquist v. Mauclet*, 432 U.S. 1 (1977).  In explaining the rationale of *Mathews*, the Court also noted  that, "<u>classifications by a State</u> that are based on alienage are inherently suspect and subject to close judicial scrutiny."  *Id.* at 7 (emphasis supplied) (internal quotation marks omitted).  "Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States."  *Id*. at 7 n.8.  The Court also emphasized the inherent discriminatory intent of the statute, noting that the law "is directed at aliens and . . . only aliens are harmed by it."  *Id.* at 9.

### III. Application of *Graham* by the Majority

Given this background of the Court's consistent application of strict scrutiny to a state statute that discriminates between citizens and resident aliens,

we turn to the majority's analysis. The majority first recognizes that a "central holding" of *Graham* is that "state laws creating citizen-alien classifications must meet strict scrutiny." Maj. op. at 16. But the majority soon reverses and declares that *Graham* does *not* apply because "we have specific Congressional authorization for the state's action, the PRWORA." *Id*. at 19. As a result, the majority appears to have conflated the twin holdings of *Graham,* which has resulted in a misapplication of *Graham*'s central tenet.

### A. The Majority's Misapplication of *Graham*

As indicated above, *Graham* held *first,* that we must subject a state's classifications based on alienage to "close judicial scrutiny." 403 U.S. at 372. The Court went on to hold that "[a]n additional reason*"* a state statute might not "withstand constitutional scrutiny emerges from the area of federal-state relations," citing conflict with "overriding national policies" where the federal government has occupied the field with its "superior authority." *Id*. at 376-78 (emphasis supplied). As mentioned above, the plaintiffs do not argue that the statute violates the preemption prong of *Graham.* Plaintiffs' arguments stem from the discrete strict scrutiny holding of *Graham.*

The majority correctly concludes that *Mathews* does not apply, because ""[u]nlike *Mathews*, here we have a state-administered program*.*" Maj. op. at 19

-12-

(emphasis supplied). While holding that a rational basis test applies to *federal* policy regarding an alien's eligibility for welfare programs, the Court recognized that a similar "division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification." *Mathews*, 426 U.S. at 85. As the majority indicates, the circuit cases applying rational basis to a federal statutory classification of aliens, as administered by a state, routinely recognize that "the strict scrutiny standard does apply to Fourteenth Amendment equal protection challenges to a *state's* classification of aliens." *Rodriguez v. United States,* 169 F.3d 1342, 1347 (11th Cir. 1999) (citing *Graham*); *Aleman v. Glickman*, 217 F.3d 1191, 1199 n.5 (9th Cir. 2000) (recognizing that *Mathews* noted "equal protection analysis . . . involves significantly different considerations [when] it concerns the relationship between aliens and the States rather than between aliens and the Federal Government") (quoting *Mathews*, 426 U.S. at 84-85) (alterations in original); *City of Chicago v. Shalala,* 189 F.3d 598, 605 (7th Cir. 1999) ("'The States enjoy no power with respect to the classification of aliens.'") (quoting *Plyler*, 457 U.S. at 225); *see also Lewis v. Thompson*, 252 F.3d 567, 583 (2d Cir. 2001) (plaintiffs do not contest that rational basis scrutiny applies to federal classification of eligibility for welfare benefits to the extent that they are asserting harm to themselves).

**B. The Majority's Reading of the State Courts' Application of *Graham***

Turning to the state courts that have applied restrictions and classifications based on alienage, the majority presents *Aliessa v. Novello*, 754 N.E.2d 1085 (N.Y. 2001), and *Doe v. Comm'r of Transitional Assistance*, 773 N.E.2d 404 (Mass. 2002), as adopting contending approaches: *Aliessa* applied strict scrutiny to a state's termination of state Medicaid coverage for many qualified aliens, while *Doe* applied a rational basis analysis to "state-made intra-alien classifications." Maj. op. at 23. In fact, a closer reading of the cases reveals that the New York State Court of Appeals and the Massachusetts Supreme Court decisions are not incongruous, but are in fact, complementary and represent a consistent application of the Supreme Court's jurisprudence in the wake of *Graham.*

### 1. *Aliessa*

The New York State legislature enacted Social Service Law § 122, which terminated Medicaid for various non-qualified aliens and placed a five-year residency requirement for eligibility for state Medicaid benefits. This latter group included lawfully admitted permanent residents.

As the majority opinion points out, "[t]he parties' equal protection arguments in *Aliessa* mirrored those of the parties in this case: the plaintiffs argued that the state law discriminated based on alienage and that strict scrutiny should apply, and the state argued that it was acting with Congress's permission

and that rational-basis review was appropriate." Maj. op. at 21. The New York

Court of Appeals presented a convincing rejection of the New York statute at

issue:

> We conclude that section 122 is subject to–and cannot pass–strict
> scrutiny, notwithstanding title IV's authorization. Because title IV
> authorizes each State to extend the ineligibility period for Federal
> Medicaid beyond the mandatory five years and terminate Federal
> Medicaid eligibility for certain refugees and asylees after seven years
> . . ., it is directly in the teeth of Graham insofar as it allows the States
> to "adopt divergent laws on the subject of citizenship requirements
> for federally supported welfare programs." . . . Moreover, title IV
> goes significantly beyond what the *Graham* Court declared
> constitutionally questionable. In the name of national immigration
> policy, it impermissibly authorizes each State to decide whether to
> disqualify many otherwise eligible aliens from State Medicaid.
> Section 122 is a product of this authorization. In light of *Graham* and
> its progeny, title IV can give section 122 no special insulation from
> strict scrutiny review. Thus, section 122 must be evaluated as any
> other State statute that classifies based on alienage. We hold that
> section 122 violates the Equal Protection Clauses of the United States
> and New York State Constitutions insofar as it denies State Medicaid
> to otherwise eligible PRUCOLs and lawfully admitted permanent
> residents based on their status as aliens.

*Aliessa*, 754 N.E.2d at 1098-99 (internal citation omitted) (emphasis supplied); *see*

Maj. op. at 21-23.

### 2. *Doe*

In *Doe*, the Massachusetts Supreme Court applied rational basis analysis to

a supplemental benefits program that imposed a residency requirement on

qualified aliens applying for benefits. A key difference in the Massachusetts

Supreme Court's analysis, noted in the majority opinion only by a parenthetical, is

-15-

that the program affected in Massachusetts was a *supplemental* benefits program that was open to only aliens and designed *to benefit only aliens*; that is, the program was enacted by the state legislature to supplement federal benefits that had been taken away from Massachusetts aliens by Congress. *See Doe*, 773 N.E.2d at 411 ("It is undisputed that the Massachusetts Legislature was not required to establish the supplemental benefits program. It is also undisputed that the supplemental program provides no benefits to citizens, and that the only persons eligible for benefits are qualified aliens.").

The court held it axiomatic that the supplemental program crafted to restore benefits to aliens could not discriminate against aliens and in favor of citizens. *Id.* ("[W]e are left to determine what standard of review to apply to a State law that does not discriminate between citizens and aliens."). Thus, noting the "critical differences" between the New York and Massachusetts statutes, 773 N.E.2d at 412, and heeding the admonitions of *Nyquist* that strict scrutiny applies to a statute that "discriminate[s] only within the class of aliens," 432 U.S. at 8, the Massachusetts Supreme Court determined that *Aliessa*'s strict scrutiny review could not apply. *See Doe*, 773 N.E.2d at 412 (distinguishing *Nyquist*: Unlike the New York statute at issue there, "the Massachusetts statute establishes a program open only to aliens, imposes a residency requirement on all who are qualified to apply for its benefits, and does not harm aliens by barring them from the benefits of the program."); *id.* at 413 (distinguishing *Aliessa*: "Unlike the supplemental

-16-

program created [by the Massachusetts Legislature], the amended New York State Medicaid program presented . . . the very paradigm so definitively addressed in *Graham*.").  It is this distinction between the Colorado and Massachusetts statutes that mandates we view S.B. 03-176 through the lens of strict scrutiny.  Thus, the Massachusetts court did not reach a decision inconsistent with *Aliessa*; in fact, the court cited *Aliessa* with approval and carefully distinguished its holding.  *Id.* at 413.

### IV. Other Arguments Presented by the Defendant

The defendant vehemently resists the application of strict scrutiny to S.B. 03-176 and professes three additional or alternative reasons to apply rational basis examination: (1) Colorado's need to protect its fiscal integrity; (2 ) S.B. 03-176 reallocates federal, not state benefits; and (3) PRWORA actually authorized the enactment of S.B. 03-176.  None of these arguments is persuasive.

#### A. Fiscal Integrity

First, the defendant cites Colorado's vital economic interest in promulgating S.B. 03-176, arguing that the measure is necessary to balance the $850 million budget deficit.  The State estimates that it will save $5.9 million (or 0.67% of the total $869 million in the State's budget deficit) annually by eliminating medical coverage to legal aliens.

-17-

In applying a rational basis test to the pro-alien statute at issue in *Doe*, the Massachusetts Supreme Court clearly considered the purpose and the "clearly <u>noninvidious</u> intent behind [the program's] promulgation" when it applied the rational basis test. *See* Maj. op. at 24 (quoting *Doe,* 773 N.E.2d at 414) (emphasis supplied). Here, we only have the self-professed state interest of fiscal integrity, which has been squarely rejected by the United States Supreme Court:

> [A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. The saving of welfare costs cannot justify an <u>otherwise invidious classification</u>.

*Graham*, 403 U.S. at 374-75 (internal quotation marks omitted) (emphasis supplied). The impact upon the State is "not very significant in comparison to the irreparable harm that would be caused" to those denied coverage. *Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1553 (D. Kan. 1993). Furthermore, "[t]he state is in a much better position to absorb the budgetary impact of delayed implementation of the amendment as compared to individual plaintiffs." *Id.*[3]

---

[3] Apart from the legal problems this statute faces, it is not completely clear that it would pass a rational basis test. As noted, the aliens affected by S.B. 03-176 include those who pay taxes–just like all other law-abiding Coloradans–and those legal aliens who serve in the military. Furthermore, there is no indication that immigrants will require more public assistance that similarly situated natives. *See* Robert Kaestner, "*Should Immigrants Be Singled Out?*" 15 POL'Y F. 1 (2002). In fact, recent studies have indicated that "immigrants are more likely than similarly situated natives to achieve economic self-sufficiency," irrespective of public benefits. *Id.* at 3. "[I]mmigrants are not a group in need of unusually strong

(continued...)

-18-

Colorado's suggestion that the preservation of its fiscal integrity, through a projected savings of $5.9 million, warrants the upholding of S.B. 03-176 is not sustainable.

### B. S.B. 03-176 Reallocates Federal, not State Benefits

Second, the defendant's argument that S.B. 03-176 is essentially a reallocation of federal, not state, benefits does not insulate its discriminatory program from strict scrutiny review. The defendant emphasizes Congress's reading of *Graham*'s holding as one curtailing the states from "deny[ing] legal permanent residents <u>State-funded</u> assistance." Aple's Br. at 14 (quoting H.R. Conf. Rep. No. 104-725 (1996)) (emphasis supplied). In addition, the district court denied a preliminary injunction largely because "[t]he program at issue here is not a state-only funded program as in *Graham* and *Aliessa*." Dist. Ct. Order at 8. S.B. 03-176 impacts a "jointly funded component of Medicaid." *Id.*

---

(...continued)

incentives to become economically self-sufficient." *Id.* The denial of benefits will not necessarily reduce the composition or number of immigrants locating in any particular state. *Id.*

Colorado's enactment of S.B. 03-176 was largely based on reallocating public resources in an effort to achieve a balanced budget, Aple's Br. at 28, and this decision appears to have no compelling rationale, apart from "anti-immigrant sentiment." Kaestner , *supra,* at 3. Noting that rational basis tests require more rationality than they used to, it is not clear to me on this record that the statute meets rationality. I do not reach this, however, because the proper test is strict scrutiny, and it is clear that "level of scrutiny is essentially dispositive of [this] litigation." Dist. Ct. Order at 7.

However, *Graham*'s strict scrutiny analysis was in no way limited to state-funded programs. *See Graham*, 403 U.S. at 367 (noting that the Arizona state program was "supported in part by federal grants-in-aid and administered by the States under federal guidelines"); *id.* at 368 (noting that Pennsylvania's general assistance program was "not federally supported"); *id.* at 376 (striking down both statutes for failure to satisfy strict scrutiny); *see also Nyquist*, 432 U.S. at 3 n.2 (applying strict scrutiny to loan program in question which was "largely subsidized by the Federal Government"). Thus, the defendant's reliance on the statute's mis-reading of Supreme Court case law is unpersuasive.

In a similar vein, the defendant maintains that Congress has devolved its plenary powers to determine alien eligibility for welfare benefits, by "allowing states to choose to extend benefits to other subgroups [of aliens] when administering federal programs." Aple's Br. at 14. As noted above, plaintiffs concede that PRWORA grants the states the power to act under § 1612(b). As such, this analysis only applies to Part III of *Graham*, not to *Graham*'s strict scrutiny analysis in Part II of the opinion.

"The authority to control immigration–to admit or exclude aliens–is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also* The Federalist No. 32, at 201 (Alexander Hamilton) (Jacob E. Cook, ed., 1961) (noting that the federal government had exclusive jurisdiction where the Constitution granted Congress the power to make uniform laws, and "[t]his must

-20-

necessarily be exclusive; because if each State had power to prescribe a DISTINCT rule, there could be no UNIFORM rule"). To permit a comprehensive Congressional devolution of its exclusive powers would be tantamount to saying "that those lawfully admitted to the country under the authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the states as chose to offer hospitality." *Truax*, 239 U.S. at 42. To allow such divergence and discrimination in the welfare rights arena would be to ignore the "crucial role . . . such benefits play in providing the poor with 'means to obtain essential food, clothing, housing, and medical care.'" *Nyquist,* 432 U.S. at 13 (Burger, C.J., dissenting) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970); *id.* ("Welfare benefits [are] essential to sustain life for aliens [eligible for such benefits.]")). *See also Plyler*, 457 U.S. at 219 n.19 ("[I]f the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction.") (citing *DeCanas*, 424 U.S. 351) (preemption case focusing on supremacy clause and the INA)).

As the New York Court of Appeals noted, "[i]f the rule were uniform, each State would carry out the same policy under the mandate of Congress." *Aliessa*, 96 N.E.2d at 1098 (emphasis supplied); *see* Wendy Zimmermann and Karen C. Tumlin, *Patchwork Policies: State Assistance for Immigrants Under Welfare*

*Reform* (The Urban Institute 1999), *available at*

http://www.urban.org/url.cfm?ID=309007. To apply PRWORA as the defendants

interpret it, Congress is advocating "potentially wide variation based on localized

or idiosyncratic concepts of largesse, economics and politics," which only

"exacerbates the lack of uniformity." *Aliessa*, 754 N.E.2d at 1098. Moreover, the

United States concedes that PRWORA promotes such variations noting that it

"represents a <u>compromise</u> on a difficult public policy question because it enables

some States to be relatively generous without imposing an unacceptably heavy

burden on other States." U.S. Br. at 17 (emphasis supplied). To allow a

patchwork of state policies to prop up this admitted compromise does not support

Colorado's construction of PRWORA. Indeed, the government's candid and

proper admission that Congress could not decide on a federal policy but achieved a

"compromise" clearly reveals no uniform policy was adopted.


### C. PRWORA Authorized the Enactment of S.B. 03-176

Third, the defendant argues that Title IV of PRWORA authorized

Colorado's enactment of S.B. 03-176. To apply separate standards of review to

states that act pursuant to PRWORA would lead to "an absurd construction of

PRWORA." Aple's Br. at 11. The benefits Congress delineated as "optional"

become "mandatory." *Id.*

The Supreme Court rejected a similar argument put forth by Arizona in *Graham*. In Part IV of its opinion, the Court considered, and rejected, Arizona's argument that the durational requirement was actually authorized by federal law. The Court stated that "[o]n its face, the statute does not affirmatively authorize, much less command, the States to adopt durational residency requirements or other eligibility restrictions applicable to aliens." 403 U.S. at 381.

Under this theory, there would be few if any limits to a state's ability to discriminate against legal immigrants once given the "option." In *Graham*, the Court considered the legislative history of the Congressional acts at issue, and rejected this theory. The Court noted that to the extent Congress sought to "authorize discriminatory treatment of aliens at the <u>option</u> of the States . . . <u>serious constitutional questions are presented</u>." *Graham*, 403 U.S. at 382 (emphasis supplied).

In addition, Congress itself anticipated that state laws that alter legal aliens' eligibility for jointly funded benefit programs enacted pursuant to § 1607 would be subject to strict scrutiny. Section 8 U.S.C. § 1601(7) states:

> With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

*Id.* Congress clearly anticipated that state statutes would be challenged, and hoped that in explaining *Graham* and enunciating that such state policies would satisfy *Graham*'s strict scrutiny, the state programs might survive strict scrutiny.[4] *See* H.R. REP. NO. 104-651, at 1445-46. But in our constitutional structure it is for the courts to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and, "[a]lthough the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Graham*, 403 U.S. at 382 (emphasis supplied). As a result, S.B. 03-176 would be still subject to strict scrutiny.

## V. Conclusion

"Resident aliens are obligated to pay their full share of the taxes that support the assistance programs [at issue.]" *Nyquist*, 432 U.S. at 12. The Court's "previous decisions have emphasized that immigrant aliens have been lawfully

---

[4]     As indicative of the true workings of the Colorado statute, I also emphasize the language of the Notice of Medicaid Closure form that was to be sent to recipients that did not return the redetermination packet. *See* Maj. op. at 38. The Notice states that

> The household member(s) listed above lost their Medicaid because <u>a new state law changed the citizenship requirements for the program</u>.

Aplt's App. at 136 (emphasis supplied). Question (2) of the redetermination packet asked "Is this person a U.S. citizen?" *Id.* at 132. Clearly, the State recognizes that the entirety of the class is affected.

-24-

admitted to this country for permanent residence and share many of the normal burdens of citizenship, such as the duty to pay taxes and to serve in the Armed Forces." *Toll*, 458 U.S. at 44 (Rehnquist, J., dissenting) (citing *Nyquist*, 432 U.S. at 12; *Hampton*, 426 U.S. at 107 n.30; *Sugarman*, 413 U.S. at 645; *Graham*, 403 U.S. at 376).

"[T]he denial of benefits cannot be justified on the grounds that immigrants are an especially poorly motivated group that is unlikely to achieve economic self-sufficiency." Kaestner, *supra*, at 4. We cannot forget that the laws that work to the disadvantage of those underrepresented in the political process are subject to a "more searching judicial inquiry" than the inquiry that the majority applies. *Carolene Prods. Co.*, 304 U.S. at 152 n.4. If Congress wants to pass a uniform policy under its plenary immigration powers, it is certainly free to do so. But our "constitutional law appropriately exists," as Dean Ely so ably stated, "for those situations where representative government cannot be trusted, not those where we know it can." ELY, *supra* at 183. The Constitution protects minorities, which we all are, in one way or another.

Accordingly, I dissent.[5]

---

[5] Because I would reverse the district court's denial of a preliminary injunction to the plaintiffs, I do not separately address the procedural violations alleged by plaintiffs. To the extent that the majority reverses the district court's denial of a preliminary injunction for purposes of redetermination, I agree with this holding.